The opinion of the court was delivered by
Duncan, J.
I postponed the decision on a motion for a new trial, to take the opinion of the whole court, in a case in which there could be no appeal under the Circuit Court law; and the defendant’s counsel has been heard in support of the motion, in a very full and able argument. The motion in arrest of judgment has been withdrawn.
This is not to be considered as a precedent for the right of defendants, in criminal prosecutions, to an adjournment before judgment, to have the cause heard on motion for a new trial. Such delay would be mischievous, and retard judgments on indictments. It was a matter, at my own suggestion, and for my own satisfaction, where the question was of general concern. It has relieved my mind from uneasiness, in deciding alone in a case of this magnitude, deeply affecting the public interest, as well as the interest of the defendant; lest I should have fallen into error, to which all men are liable, and none more so than myself: an error from which the party could not be relieved. The judges who have heard the argument, with the exception of Judge Rogers, who dissents in some particulars, which will be hereafter noticed, have assured me that there is no error in the charge, and that they find no cause for granting a new trial.
The great question was one of fact, submitted to the jury, and who have found the fact of dedication, by the owners of the soil, to the public use of the ground by the name of Water Street, the locus in quo, and that the street, called Water Street, from Grant Street, extends along the Monongahelá river to the confluence of that river, with the Allegheny and Ohio, the breadth and all the space, between the lines in Woods’ map and the Monongahela, river.
I am entirely satisfied with the verdict: the evidence was full, satisfactory, and conclusive. It is proper to premise, that this is not a case in which any peculiar right of the city of Pittsburg to the ferriages and tolls is in any way involved; any special or particular rights of the citizens passed on in judgment; but merely the right of the public, to use this ground, as a street, road, and highway. It decides the public right, and that alone: nor is it a case of deviations in buildings, or in the location of streets, from the strict lines of the map, made either by accident or for mutual benefit, or alteration of the plan itself, made for mutual aceommoda *397 tion, and long acquiesced in by the original owners and the inhabitants. When such a case arises, it will be time enough to decide it. All I will say at present is, that the decision need create no alarm on this score. This is a very different case; for it is a claim of right to obstruct, and an actual obstruction of the whole street. If, then, this is a question of public right, in the event of which, no citizen of Pittsburg, and holding lots here, can derive any immediate interest; then James Ross was a competent witness. In the case of a public nuisance, no one can support a private action, unless for some special grievance or injury — particular damage, as the obstruction laming himself or horse. James Ross had no more interest in the prosecution than any other citizen of the state, of the United States, or of the world, because all had equally the right of passage. This has no resemblance to that to which it has been compared; indictment for forcible entry and detainer, where, though the form is a, criminal prosecution, it is in the nature of a civil remedy, for the restitution speedily of a possession- forcibly taken and detained. The party has there a direct and immediate interest, the restitution of his possession being part of the sentence.
The objection to the charge maybe compressed within a narrow compass. The effect of the agreement of January, 1784, and the receipt of August, 1784, on the conveyance of December, 1784. I do not know that I can make the exposition clearer, by any further illustration, than I have expressed it in the charge; but a more particular detail may be expected.
As early as 1784, when Craig and Bayard entered into a contract with the Penns, it is a natural presumption, that it was in the contemplation of the parties to lay out a town at the confluence of these three great rivers. Nature had pointed it out as a most important station. There was then a town there, though not laid out by any regular plan. The agreement was inchoate, executory, and imperfect; the quantity not precisely ascertained; three acres, more or less; the price to depend on future sales to be made within a year. When the spring opened, the Penns proceeded to lay out a town: employ the agent, Mr. Woods, who, in May, 1784, laid out the town, included these three acres in the town plot, run Water Street through it, and divided the whole into lots — building lots— designated these lots by numbers; in that plot bounded by Water Street, we find lots Nos. 143, 144, and 145. After the town had been laid out, when the plan had been returned to the proprietors, and the purchase money paid, in August, 1784, this first agreement was rescinded, and a new contract entered into: the small piece of ground at the confluence of the rivers, containing three acres, more or less, as described in the agreement of January, then assumes a new shape and form, and the transaction was that day changed into a sale of thirty-two lots in the town of Pittsburg. The said lots are bounded by the rivers Allegheny and Monongahela, Mar-bury, Penn, Liberty, and West Streets; and are numbered in Mr. *398 Woods’ plan of Pittsburg, Nos. 1, 2, to 17, Nos. 132 to 14S, and 260. This was a rescission of the first contract, the substitution of another at a fixed price, the extension of the first, and a sale of lots marked and completely identified by Woods’ map, leaves nothing in doubt, nothing requiring explanation. A re/erence to the map, always ascertained by a glance of the eye, the situation and dimensions of the grant. When the conveyance came to be executed, the contract completed, the description is nearly in the words of the receipt of August:—
“Thirty-two lots or pieces of ground, situated in a point formed by the junction of the two rivers Monongahela and Allegheny, in the town of Pittsburg, marked by the general plan of the said town, made by Col. Woods, Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, Nos. 10, 11, 12, 13, 14, 15, 16, 17, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, and 260; and which said plan is recorded, or intended to be recorded, in the office for recording deeds in Westmoreland county. The said lots, Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, are bounded northwardly by the said Allegheny river, eastwardly by Marbury Street, southwardly by Penn Street, and southwardly by the said Monongahela river. The said lots, Nos. 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, are bounded southwardly by the said river Monongahela, northwardly by Penn Street, eastwardly by Marbury Street, and southwardly by Liberty Street, and the lot of ground No. 145, bounded southwardly by the said Monongahela river, north-westwardly by Liberty Street, northwardly by Front Street, and southwardly by West Street.”
The thirty-two lots conveyed, are the thirty-two lots in the town of Pittsburg, marked in the general plan of the said town by Col. Woods, by Nos. 1, 2, 3, &e. Common sense would say, it is necessary only to cast your eye upon Woods’ map, to find out what was bought, and what was sold, and the plan of Col. Woods is made, in explicit terms, the land mark. The muniment to be referred to was to be recorded in Westmoreland, if it had not already been done. The sale, as strong as words can render any thing, was by the map as certain as if the courses and distances of each number had been particularly set forth in the conveyance. The reference to Woods’ plan, without any thing else, was a certain description: it clearly ascertained the thing granted. 17 Mass. 27. The addition of the Monongahela river was mere surplusage: was the addition of a mistaken or false circumstance, and would not frustrate that which was before certain. The surplusage would be rejected. Jackson v. Clark, 7 Johns. 257. Jackson v. Looney, 85 Johns. 85. 4 Mass. 146. Dyer, 376. Hobart, 170. If it is not rejected, and the map adhered to, what is conveyed? Not the lots 143, 144, and 145, because they adjoin, not the water, but Water Street. They are something very different — different in point of situation, and very different in quantity. The conveyance would be of something more than those numbers in Woods' *399 map, going out of and beyond those boundaries; something which Craig and Bayard had not paid for. The map was to be the standard: it was to be recorded in perpetuam rei memoriam. The conveyances of the Penns were always by the number of the map. The purchaser put his finger on the number he wanted in Woods’ map; and the description, and, I add, the only certain description, by which all the lots in Pittsburg are held, is by a reference to the map, which is the great charter of the rights of all. If Craig and Bayard did not buy the numbers in the map, then they have no rights, as the grant is without quantity or dimensions.
There is but one rule nów in construing conveyances — the intent of the parties. All words give way to the intent. It would be difficult for courts of justice not to construe the reference to numbers in Woods’ map, as explanatory of the intent of the parties; and, if it were necessary, restrictive of the words, Monongahela river. Gascoyne v. Barker, 3 Atk. 9. The map and the numbers are all part of the same sentence. The sentence was not perfect before, and it conveyed nothing-certain, described nothing certain — thirty-two pieces or lots of ground at the confluence of the rivers, bounded by the junction of the river Allegheny and Monongahela. What thirty-two pieces or lots of ground? Why the thirty-two by their numbers in Woods’ map.
It is the map which gives the description, and the map was to be recorded as perpetual evidence of the boundaries of the lots. Nothing more was conveyed than the lots as delineated in the map, and designated by the numbers. This conveyance, therefore, does not include the ground; the defendant can have no right to enclose it as appendant or appurtenant to his grant; and there is, in my opinion, no rational ground to say, that sixty feet was dedicated to the public use, and all from that down to the water was included in the numbers granted to Craig and Bayard.
Nor is there any thing on which to found an argument, that all to the water’s edge was granted to Craig and' Bayard, subject to the right of easement of a public highway, sixty feet in breadth, because the grant is limited to the ground contained in the numbers, as designated in Woods’ plan. The original agreement was extinct, a new one made. It can have no effect in th.e construction of the conveyance, and that was by the plan just before made; the parties could not have had in view to derange, dislocate, or break in on the plan. ■ They profess to contract in conformity to it, and in conformity to the numbers; they adopt that plan, and regulate their conveyance by it. It is impossible to reconcile the boundary of the river, with the grant by the map. The moment you refer to the plan or plat of the tovvn, which is a certain and complete description of itself, requiring nothing extraneous to designate it, the boundary by the river is lost, the map excludes it; that circumstance is a mistake, and this on every rule of construction is to be disregarded as surplusage. Nos. 143,' 144, and 145, convey all *400 •within certain limits; nothing beyond those limits is granted; the locus in quo is not within those limits.
There remains only to be considered the operation of time, as a bar to the prosecution of this public offence. As to the presumption of a grant, from a length of time, this would be a most unwarrantable presumption, a presumption, contrary to all positive evidence in the cause: from whom could this grant be? The Penns could not, because they had dedicated it to public use; the city did not; the state did not! All the conveyances from the Penns have been produced, it is not pretended that any other deed exists: the recitals in all the mesne conveyances prove this. The deed of 1797, from Turnbull, Holkar, and Marmie to Jones, is in these words: “ Do grant, bargain, and sell the two lots, Nos. 143 and 144, marked in the general plan of the said town, made by Col. Woods;” and the sheriff’s deed to the defendant is, “ of all the right, title, and interest of James Jones to parts of lots Nos. 143 and 144, in Woods’ plan of lots in the city of Pittsburg,” and, though it designates the lots as extending to the Monongahela river, yet it is only a sale of lots Nos. 143 and 144; and James Jones’ interest in these lots, so that in every conveyance, in every recital down from the proprietors to the defendant, it is of the lots by their numbers. There is no room for presumption; the defendant does not show or pretend that any thing ever was granted by the Penns, except in the papers he has produced, the very, circumstance of the defendant appearing and showing these papers excludes all presumption of any other grant. Penn’s Lessee v. Kline, 4 Dall. 403. Who was capable of transferring? if any one the Penns; the defendant has shown that they did not: his conveyance proves this, and the technical presumption necessarily assumes that it was practicable to transfer the right by means of a grant or -other conveyance: hence, the presumption does not operate, when such a grant could not from the nature of the case have been made. 2 Stark, on Ev. 1219. Who could convey this street? No one but the legislature. The Court of Quarter Sessions could not vacate it under the general road law. To presume a grant, would be presumption run mad, it would be against the positive proof in the cause: whatever the defendant’s grants are, he has shown, and they exclude all presumption of others. All the cases of presumption have been for private nuisances and in civil actions; and there the presumption of a grant of an incorporeal right affecting the rights of another from length of time, may be rebutted by proof that the enjoyment was acquiesced in, not by the owner of the inheritance, but by one who possessed a temporary interest only; suchas tenant for life or years, whose negligence or laches cannot be allowed to prejudice the owner of the inheritance. Stark. 1218. 2 Wms. Saunders, 175, d. How much less then, ought the acquiescence of the neighbours in a public nuisance affect the public right? And this is the reason why no length of time will legalize a public nuisance, though it may afford an answer to an action of a private in *401 dividual. Chitty’s Crim. Law, 132. Unless where there is a limit to prosecutions by statute, there is no limit; there are some offences which by particular statutes must be prosecuted within a limited time, and this shows the general law to be to the contrary.
Public rights cannot be destroyed by long continued encroachments: at least the party who claims the exercise of any right, inconsistent with the free enjoyment of a public easement or privilege, must put himself upon the ground,of prescription, unless he has a grant or some valid authority from the government. The Inhabitants of Arundel v. Hugh M'Cullough, 10 Mass. 70.
A right of prescription cannot exist in the present case, because the street itself is within the memory of man; when it was laid out is well established; the buildings and erections are recent; the defendant has proved when they were made. When a building has continued time out of mind, then it is an ancient one, and it will be intended that it was first put up by a composition with the owner of the land, on laying out the road. 1 Hawk. 694. But the positive proof is to the contrary of all this: these buildings were erected long after the street was laid out. There was mo composition with the Penns; there could be no agreement at the laying out of the town, and the-act of the 22nd of April, 1794, erecting Pittsburg into a borough, is conclusive on the operation of time. 2 Dall. State L. 588. The last section of that act gives to the borough of Pittsburg all such powers, jurisdiction, &c., as are enjoyed by the burgésses and inhabitants of Reading. That act of incorporation, 2 Dall. State L. 124, provides that where any buildings have been heretofore erected within the original plan of the said borough, and shall happen to eneroách on any of the said streets, they shall not be deemed nuisances or abateable as such; but, to prevent a continuance of such encroachments, after such buildings shall be decayed or require rebuilding, the owner of said buildings shall not rebuild on the street, and in case he shall so rebuild, the same shall be taken and adjudged a public nuisance, and be abateable as such. Thus by positive law, we can see no time can legalize these encroachments, or be a bar to the public prosecution; but that they shall be abateable:.the encroachments here have all been made since this act, or all have been repaired since its passage.
I will now state the reasons of Judge Rogers’s dissent:—