## PEARSALL vs. POST.

### SAME vs. HEWLETT.

The *public* has not the right to *use* and *occupy* the soil of an individual adjoining navigable waters, as a *public landing* and *place of deposit* of property in its transit, *against the will of the owner*, although such *user* has been continued for more than twenty years.   The *user* cannot be urged *by the public*, either as the foundation of a legal presumption of a *grant*, and thus justify a claim by prescription, or as evidence of *dedication* of the premises to public use.

The capacity of the *public at large*, as distinguished from corporations or *quasi* corporations, to *acquire a right* to use and occupy the soil of an individual in any manner or mode of appropriation, *other than to pass and travel over it*, and the setting up of such right as prescriptive upon the presumption of a *grant*, or that the owner has *dedicated* the premises to public use—considered, and a variety of cases cited and commented upon.

So, also, the rights of *riparian owners* considered in respect to *ferries*, where passengers and merhandize are landed on the shores of rivers; and the distinction *existing* between *passing* over the soil where a road has been laid out, and *using* it as a *landing*.

So, also, the validity of *grants* considered, where there are no persons *in esse* capable at the time of taking as *grantees*, whether such grants be for religious or charitable purposes, or to promote the cause of education.

The commissioners of highways of the counties of Suffolk, Kings and Queens (the Long Island counties) have power to *regulate public landings* and *watering places* already existing, but not to *lay out* and establish *new* public landings and watering places.   Nor can *encroachments* upon such *landings* be summarily inquired into by a jury, as may be done in cases of encroachments upon *highways;* their power is limited to highways.

THE first of these cases was an action of trespass *quare clausum fregit*, for entering upon the land of the plaintiff, tearing down fences and depositing upon his land a quantity of manure. The *second* was an action of *assault and battery*, attempted to be justified upon the same grounds that the entry upon the lands were sought to be justified.   Both causes were tried before the Hon. CHARLES H. RUGGLES, one of the circuit judges.

The plaintiff is the owner of a farm in the town of North Hempstead, in the county of Queens, on Long Island, adjoining Hempstead harbor, which has belonged to his ancestors for

upwards of a century. On this farm there is a *landing* called *Pearsall's landing*, which, on the trial of the first above cause, it was proved had been used by the public ever since 1764, for the purpose of loading and unloading vessels, and for the deposit of wood and other property carried to and from the landing. About the year 1800, the farmers in the vicinity of the landing began the practice, which has continued ever since, of bringing manure from the city of New-York and depositing it upon the landing, so that not unfrequently an area of one and a half acres would be covered. Shortly previous to February, 1835, the plaintiff enclosed with a fence that portion of his farm called the landing, it never before having been enclosed, and on the arrival of the first vessel in that year with manure, the acts took place for which the first above suit was brought. The suit against *Hewlett* was brought under the following circumstances : On the 17th March, 1835, Hewlett, being a *commissioner of highways*, went on the *locus in quo* with a number of men, cattle and implements, and commenced ploughing and scraping down a knoll. The plaintiff forbade him, and ordered him to depart, and on his refusing to do so, took hold of him for the purpose of removing him, when the assault and battery complained of took place. The defendant offered to prove that at the time when the plaintiff forbade his proceedings, he was acting in pursuance of a determination previously made by the commissioners of highways, to regulate, repair and alter the landing place in question ; but the evidence being objected to, was rejected by the judge. The defendant also offered to prove that on the 25th March, 1835, proceedings were instituted against the plaintiff under the act regulating highways and bridges in the county of Suffolk, Queens and Kings, for an *encroachment* upon the landing by the erection of the fence, (in which proceedings, the *locus in quo* is designated as a " certain highway or public landing,") and that a jury were summoned, who after hearing the evidence, *certified* that the place in question *had been encroached upon* by the plaintiff; but this evidence also being objected to, was rejected by the judge. In relation

to the *user* of the landing by the public, the same evidence in substance was given in this case as in the former. The judge charged the jury in the *first case*, that the *public* might acquire a right or easement in the lands of an individual by *dedication* to the public use, and that such dedication might be by writing or without writing ; that in this case there was no direct evidence of the act of dedication by the owner of the fee, but that the defendant relied upon long continued user. He instructed the jury that such user between individuals, would be *evidence of a grant;* and that as between the *owner* of the fee and the *public,* an actual and uninterrupted user for twenty years, accompanied by a claim of right brought home to the knowledge of the owner, was *evidence of dedication.* During a portion of the twenty years, the property was held by individuals under *particular estates;* the time of the continuance of which estates the judge directed the jury to exclude from their consideration, as it regarded the question of acquiescence. *The jury found a verdict for the defendant.* In the *second cause,* the only question submitted was that of *damages,* and the jury found for the plaintiff, with six cents damages and six cents costs. The plaintiff in the first, and the defendant in the second cause, applied for new trials. Both causes were heard in one argument.

*H. P. Edwards,* for the plaintiff, 1. That the verdict in the first cause was against evidence ; 2. That the right of the *public* to use the *locus in quo* as a *landing place* and *place of deposit,* if such a right can be acquired by user, can only be acquired by an *adverse* user under a claim of right, known to the owner of the fee for the period of twenty years ; in support of this proposition, he cited 1 *Greenleaf,* 111 ; 3 *id.* 122 ; 1 *Yeates,* 167 ; 9 *Serg. & Rawle,* 31 ; 9 *Pickering,* 256 ; 13 *id.* 240 ; 2 *id.* 46 ; 14 *Mass. R.* 52 ; 9 *Johns. R.* 167 ; 7 *Wheaton,* 59, 109, 110 ; 3 *Starkie's Ev.* 1201, *tit. Prescription ; id.* 1217, 18 ; 3 *Kent's Comm.* 444 ; 2 *Brod. & Bing.* 667 ; 1 *Price,* 247 ; *Adams on Ejectment,* 48, *n.* ; 1 *Johns. R.* 158 ; 12 *id.* 368 ; 9 *id.* 167 *and* 180 ; 8 *id.* 227 ; 13 *id.* 118 ; 18 *id.* 44; 2 *Caines,* 185. *Thirdly:* the counsel contended, that if even an adverse user had been

shown, it had not been shown to have continued for a sufficient time to ripen into a right, in consequence of the intervention of particular estates, during the existence of which no presumption could be made against the owner of the fee. *Fourthly:* he insisted that the defence could not be sustained on the principle of a *dedication,* because, he insisted, that a dedication could not be made by words, nor by mere acquiescence in a user ; it must be by acts from which the intent of the owner to dedicate the premises to the public use is necessarily inferrible. 3 *Kent's Comm.* 451, *and notes.* 6 *Cowen,* 751. *Adams on Eject.* 249, *n.* 3 ; 7 *Johns. R.* 186. *Fifthly :* he insisted that the right set up by the defendant is not an *easement,* nor an *incorporeal right* of any kind ; that it is corporeal, and can be exercised only by taking actual possession of and occupying the premises to the exclusion of the owner, i. e. by ousting him from the possession, and thus committing an act for which ejectment will lie. From all which he argued that the defence could not be sustained. In support of this point, he cited 2 *Black. Comm.* 20 ; 2 *Starkie's Ev.* 293 ; 1 *Chitty's Pl.* 220 ; *Salk.* 246 ; 7 *East,* 312 12 *id.* 141 ; 9 *Serg. & Rawle,* 31 ; 1 *Greenleaf,* 111.

*S. A. Foot,* for the defendant, insisted, 1. That the verdict in the cause of *Pearsall* v. *Post* is fully supported by the evidence ; 2. That there was a clear and unequivocal *dedication* of the landing to public use, and that the public had used it without interruption until the erection of the fence by the plaintiff in 1835 ; 3. That the *dedication* was made long before the commencement of the life estates proved to have existed in this case ; that such life estates, admitting them to have continued until 1827, could not deprive the public of the benefit of the user of the landing during the continuance of the same, because : *first,* the dedication was perfect before the life estates commenced ; *second,* if not perfect, the previous user had given the public an inchoate right, which ripened and became absolute by the continued user during the life estates, and for a period of eight years after their termination, viz. from 1827 to 1835 ; and *third,* the user was known to the remainderman during the continuance of the life estates, and was

acquiesced in by him. The counsel cited and commented upon the following cases : 6 *Wendell*, 651 ; 12 *id.* 172 ; *Woolrych on Ways*, ch. 2, *pp.* 10, 13, 14 ; *Campb.* 260; 5 *Barn. & Ald.* 458; 4 *Barn. & Cress.* 574 ; 11 *East*, 372 ; 5 *Taunt.* 34 ; 4 *Campb.* 15.

*By the Court*, COWEN, J. Assuming that the law will notice and enforce the right set up, and the sort of testimony introduced by the defendant, we perceive no foundation for granting a new trial, on the ground that the verdict was against the weight of evidence. There was enough to warrant the jury in finding for the defendant. Nor can any fault be found with the judge's charge, which put the defence to them with every qualification under which the most cautious judges have allowed the class of presumptive easements. He distinctly admonished them that before the defendant would be entitled to their verdict, they must be satisfied that there was a continuous adverse user, with the owner's knowledge, of at least twenty years, during the absolute ownership of the plaintiff, and those under whom he claimed, without estimating the particular estates of the life tenants ; and that they must also find the acts imputed as a trespass to have been done within the boundaries as indicated by the ancient user. The verdict must, therefore, be taken as finding all these facts in favor of the defendant ; and the case comes down to the two questions : 1. Is a public right of landing and deposit for all the citizens of the state known to the law ? and 2. Will the law infer such a right from ancient and adverse user by all citizens indiscriminately ?

The claim is not one of a temporary license, revocable at the will of the owner, but of a permanent legal estate, which is resembled to an individual right in fee; an incorporeal hereditament, exerciseable in the soil of another, vested, exclusive and absolute; and if to be allowed, depriving the plaintiff, in effect, of all future control over the premises except as a common occupant with his fellow citizens. The claim is novel in its character, justified by no direct precedent with us or in England ; at least we are referred to none, and is to be drawn, if at all, mainly from

principle and analogy. Both are sought for chiefly in the doctrine of dedication of ways, which truly has in this country been considerably extended by adjudication, and still more by *dicta.*

It was not denied, either on the trial or in argument at the bar, that a street, highway, or right of public passage, may be derived from a *dedication,* to be shown by the express assent of the owner of land, or inferred from an adverse user of twenty years. The English books are full to this point. *Lade* v. *Shepherd,* 2 *Stra.* 1004. *Rex* v. *Lloyd,* 1 *Campb.* 260. *Roberts* v. *Karr,* 1 *id.* 262, note (*b.*) *Rugby Charity* v. *Mereweather,* 11 *East,* 375, note. *Jervis* v. *Dean,* 3 *Bing.* 447. *Rex* v. *Barr,* 4 *Campb.* 16. This principle has been adopted by several courts of the United States. *Denning* v. *Roome,* 6 *Wendell,* 651, 656 *to* 658. *Wyman* v. *Mayor, &c.,* of *New-York,* 11 *id.* 486, *and vide* 8 *id.* 105. *Pritchard* v. *Atkinson,* 3 *N. Hamp. R.* 335. 4 *id.* 10, *S. C. and S. P. Commonwealth* v. *McDonald,* 16 *Serg. & Rawle,* 390. *Estes* v. *The Inhabitants of Troy,* 5 *Greenl.* 368. *Hollerman* v. *The Commonwealth,* 2 *Virg. Cas.* 135. *Rowell* v. *The Inhabitants of Montville,* 4 *Greenl.* 270. *The State* v. *Campton,* 2 *N. Hamp. R.* 513. *State* v. *Wilkinson,* 2 *Verm. R.* 480. *The State* v. *Gregg,* 2 *Hill's R.* 387. Such also is the law of *Scotland. Harvey* v. *Rogers,* 3 *Bligh, N. S.* 440, *on appeal to the house of lords.* And of *Ireland. Fitzpatrick* v. *Robinson,* 1 *Huds. & Br.* 585. The decisions on the point in *Massachusetts* are not very explicit; but evidently tend to the same result. *Hinckley* v. *Hastings,* 2 *Pick.* 162. *Commonwealth* v. *Low,* 3 *id.* 408. *Reed* v. *Inhabitants of Northfield,* 13 *id.* 94. In *Louisiana,* the code denies all claim by prescription to rights of servitude which in their nature are discontinuous or interrupted, *Lou. Code, art.* 723 ; and such are ways. *Broussard* v. *Etie,* 11 *Lou. R. by Curry,* 394. *Our own code,* on the contrary, has long expressly recognized the prescriptive right in a public highway. Formerly the user must have been 20 years previous to and next preceding the 21st of March, 1797, 1 *R. L. of* 1801, *p.* 595; 2 *id. of* 1813, 277, § 24, and this court seems to have considered itself bound to allow no claim founded

on user for any other term. *Galatian* v. *Gardner*, 7 *Johns. R.* 106. *The People* v. *Lawson*, 17 *id.* 277. But 20 years general occupation was allowed by the act of February 21*st*, 1817. *Laws of* 1817, *p.* 32, § 3. 1 *R. S.* 517, 2*d ed. p.* 521, § 104. And to this, as will be seen by the cases cited from *Wendell*, we have superadded the English law of *Dedication*, which, under circumstances, will certainly raise a right even short of 20 years. The present chancellor has extended and applied the doctrine to a *village square*, laid out by the original proprietor. *Watertown* v. *Cowen*, 4 *Paige*, 510. He did this on the authority of *Cincinnati* v. *White's lessee*, 6 *Pet. U. S. Rep.* 431. The latter case raised an urban right of common, or open ground laid out by the original city proprietor. *Vide Howard* v. *Rogers*, 4 *Har. & John.* 278, *contra.* It was, I find, preceded by a similar decision, after much consideration in the supreme court of Vermont, with respect to the *public square* of St. Albans. *State* v. *Wilkinson*, 2 *Vt. R.* 480. But the indictment there went on the ground of the square being a *public highway*, and called it so in both counts. The way was obstructed by a building, which was held to be a public nuisance. *Abbott* v. *Mills*, 3 *Verm. R.* 521, *and State* v. *Catlin*, *id.* 530, *S. P., as to Burlington Common and College Green. Vide also State* v. *Trask*, 6 *id.* 355. In *Cincinnati* v. *White's lessee*, it was not so necessary to characterize the right, as the action was an ejectment, adverse to the city, and founded on the title of the original proprietor. But the objection now raised in argument, and which presents the most serious difficulty in giving effect to a dedication, the *want of a grantee*, is thus treated by Mr. Justice Thompson in that case, who delivered the opinion of the court: " Dedications of land for public purposes have frequently come under the consideration of this court ; and the objections which have generally been raised against their validity have been the want of a grantee competent to take the title, applying to them the rule which prevails in private grants, that there must be a grantee as well as a grantor. But that is not the light in which this court has considered such dedications for public use. The law applies to them rules

adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and secure to the public the benefit held out and expected to be derived from and enjoyed by the dedication." The case is compared to that of *Pawlet* v. *Clark,* 9 *Cranch,* 292, 331, wherein it was said that a grant for the use of the Episcopal church, without any one of present capacity to take, placed the fee in a condition to await the legal creation of a grantee. The case of *Beatty* v. *Kurtz* 2 *Peters'* *C. C. R.* 566, is also adverted to as coming under the same notion. There a town lot was set out by the proprietor on his map, for the use of the German Dutch church, and the use was enforced in equity, though the church was a voluntary unincorporated society. In *Inglis* v. *The Sailor's Snug Harbor,* 3 *Peters' C. C. R.* 99, a devise for a charitable object was carried into effect in favor of a corporation afterwards created, the will clearly looking to such a creation. This case proceeded much on the doctrine of executory devises. The right of dedication to an unincorporated Congregational church was examined and recognized as available by Mellen, Ch. J. in *Shapleigh* v. *Pilsbury,* 1 *Greenl.* 271, 280. A similar right has been recognized in Massachusetts, *Rice* v. *Osgood,* 9 *Mass. R.* 38, 44, and finally by the present chancellor of our own state in favor of a Baptist society. *Hartford Baptist Church* v. *Witherell,* 3 *Paige,* 296. He shows that the supreme court of the United States once denied that the power could be exerted in favor of a voluntary religious society of that description, even with the aid of chancery, *Philadelphia Baptist Association* v. *Hart's Exe'rs,* 4 *Wheat.* 1 ; but had abandoned that ground in the latter cases. The same doctrine has been extended to the Catholic church. *McGirr* v. *Aaron,* 1 *Pennsylv. R., Penrose & Watts,* 49 ; to purposes of charity and education in the Lutheran church, indeed for the purposes of general education, *Witman* v. *Lex* 17. *Serg. & Rawle,* 88, 91, and last, though by no means least, for the purposes of the American Bible Society, by the case of *Burr's Ex'rs* v . *Smith,* 7 *Verm. R.* 241. In this case we are furnished with a collection from almost all the books bearing on the question, from the ear-

liest times ; the principal authorities are ably summed up and weighed by Chancellor Williams, who delivered the opinion of the court, though it must be admitted that their effect as inferred by him, is eloquently and powerfully combated by Chancellor Mattocks, who dissented from his conclusion.

In short, it seems to be well settled by the supreme court of the United States, by several courts in the neighboring states, to which we may, perhaps, add the court of chancery in this state, that dedications of land for religious and charitable purposes, as well as for public ways, and squares, commons, parks, and other easements in nature of ways, are to be upheld, although there be no person *in esse* capable of taking as a grantor at the time. It was remarked by Mr. Justice Thompson, in *Cincinnati* v. *White's lessee*, 6 *Peters' U. S. R.* 436, that " the principle, if well founded in law, must have a general application to all appropriations and dedications for public use, where there is no grantee *in esse* to take the fee." He adds, " This forms an exception to the rule applicable to private grants, and grows out of the necessity of the case." These remarks comprehend every conceivable case where a man has furnished evidence of a clear intent to give up his real estate for the purposes *of any legitimate public use;* and pursuing the parallel between highways and other public objects, the latter will stand in every variety capable of establishment by the usual proof of 20 years adverse enjoyment. A public right of landing and deposit on the shores of the ocean, or of bays and rivers, is included ; and thus we reach the claim as introduced by the present defendant and found by the jury. Between the positive aid of the court of chancery, and the rule of law which sanctions the right of a prospective grantee, though acting merely to religious, charitable and educational ends, will be found to cover a very large field which has heretofore remained pretty much uncultivated. This was in some measure shown by Chancellor Mattocks, while considering the case of *Burr's Ex'rs* v. *Smith;* and with regard to public easements of a merely temporal character, establishments for the benefit of the trading and agricultural as well as the travelling community, one can hardly suppose

less, if the principles indicated are to be carried out to their full extent. I pass over the more usual instances of easements, such as ways, commons, and water privileges, &c., enjoyed either by individuals, towns, or other corporations. In such cases there being a definite person capable of taking, there is no obstacle to presuming a grant from usage. The whole is matter of private right. We may also pass over those which are less common, and one put by Mr. Justice Thompson, in 6 *Peters,* 437, from *M'Connell* v. *Lexington,* 12 *Wheat.* 522, the reservation of a spring of water for public use. It was made to a corporation which might turn the spring to its own or public purposes. Thus, the user was invoked to establish an individual right. A like case is mentioned in *Co. Litt.* 56, *a.,* a customary watering place in the Inhabitants of Southwarke, for violating which an action was held to lie. So where the acknowledged proprietors of a fishery and their lessees had, for above 20 years, publicly landed their nets on land belonging to another, and had, at various times, repaired and improved the landing place, it was held that the jury might presume a grant of the right so exercised: *Gray* v. *Bond,* 2 *Brod. & Bing.* 667. *Hart* v. *Chalker,* 5 *Conn. R.* 311, *S. P.* The latter case related to a sand beach contiguous to Long Island Sound, and both were cases of an actual occupation of the shore. But in both, parties appeared who were capable of granting and receiving a grant ; and both are put on the ground of an actual grant presumable from the usage and other circumstances. They present us with another incorporeal hereditament, like a common, a servitude exercisable by one and his heirs, within the soil of another and his heirs. So in regard to the right of fishery itself in the waters of another. *Melvin* v. *Whiting,* 10 *Pick. R.* 295. Indeed the right inferrible from usage, both to the *servitude* of the civil, and the *easement* of the common law, rests almost without exception, on the idea of a grant between competent parties. 3 *Kent's Comm.* 3d ed. 434, 444. The only easement by dedication to the public, mentioned by the learned commentator, is the common highway or street. *Id.* 450, *and see Woolrych on Ways,* 10 *to* 14.

It is said in one case, that a way, whether public or private, is equally an incorporeal hereditament ; and the same case speaks of a grant of a public highway. *Conner* v. *New Albany*, 1 *Blackf*. 43, 45, *and see per Nelson, J. in Gidney* v. *Earl*, 12 *Wendell*, 98. But I have searched in vain among the English books for the idea of a grant which can enure to the personal use of all mankind. The adjudged cases begin with *Lade* v. *Shepard*, *in* 8 *Geo*. 2, and come down to us under the head of dedication to the public ; nor do they present a single instance of any other easement under that head. Nor am I aware of any other easement which the sovereign can be said to hold for the free use of the subject. It is true that in *Bolt* v. *Stennett*, 8 *T. R*. 606, a quay for the landing of goods was likened to a way, and it was held, might be pleaded in trespass as *public* and *open* ; but it was *for a compensation to the owner;* and the quays purchased by government are under their own regulation, at least for the purposes of the customs, and generally, if not universally, subject to a toll called keyage or wharfage ; *T*. 8 *R*. 608, *and note* (*b*.) ; *Hargr. Tracts, vol*. 1, *p*. 77 ; *Toml. Law Dict. Key and Keyage* ; whereas a public highway is most commonly free and without toll. Hammond, in his treatise on the law of *Nisi Prius*, *p*. 193, *Am. ed. of* 1823, speaking of public right by dedication, says: "The simple act of throwing open the property to the public use, without more, is sufficient to create this right, and no other formalities are essential ; the case, therefore, is *anomalous*, and general utility is the principle which sanctions this mode of conveyance." Again: " Whatever may be his (the owner's) real intention, if his conduct is at variance with his purpose, he cannot afterwards contest the right of the public, who perhaps have embarked in projects and formed expectations upon the strength of the appearances he held out to them, which it would be ruinous to disappoint." *Id*. 194. It will also be seen by several of the English and American cases cited, that the mere oral declarations and acts of the owner will warrant the presumption of a dedication, though they have been followed by public enjoyment but a very short time, and much less than 20 years. Thus, though it be of the nature of

an incorporeal hereditament, and, indeed, of all real estate, since the statute of frauds, to pass by deed only, we find a most important easement forming a plain and well established *exception.* It stands entirely independent of all *grant* or *presumption of grant.* Indeed, the *Cincinnati way of common* in 6 *Peters,* 438, was so treated by Mr. Justice Thompson. He says: "After being thus set apart for public use, and enjoyed as such, and private and individual rights acquired with reference to it, the law considers it in the nature of an *estoppel in pais,* which precludes the original owner from revoking such dedication." It is well settled that the banks of rivers and of the sea are private property, and that the public have not, at common law, even the right of towing. *Ball* v. *Herbert,* 3 *T. R.* 253, 260. It was admitted in the case cited, that such a right might grow out of general usage; but here is only another sort of way ; and we still want a case of customary exclusive occupation by the public. *And see Chambers* v. *Turry,* 1 *Yeates,* 167; *Cooper* v. *Smith,* 9 *Serg. & Rawle,* 26. It is not denied that the people, who are legally substituted for the king, may take a grant of soil, or an easement, or any profit or right implying exclusive occupation. They may take as a corporation ; but the subject of the grant then becomes their several property, in respect to which they are considered an individual with all the incidental rights and remedies. So far from such a grant conferring a general right of way, any one who should intrude upon it would be liable to an action, unless the people in their corporate or sovereign capacity had dedicated a way over it. But the *locus in quo* is not claimed in that light. The claim is for each and all persons in the state, indeed for any one in the whole world, who shall have occasion to deposit lumber, manure or other articles on the soil of the plaintiff. The question is, can such a claim be made to any right except that of way? No claim in favor of any one is named or can be named? There is no one to take, and no one to release?

I have said that the claim of the defendant is novel. I think it will appear that by English authority binding upon us, it has

been expressly denied, and that too in a series of instances, including *Gateward's case,* 6 *Rep.* 60. The action there was trespass *quare clausum fregit* and for depasturing in the plaintiff's close. The defendant justified by plea of a customary right of common for *all the inhabitants of the village of Stixwold;* and averred that at the time he was an inhabitant. On demurrer this was held bad for several reasons, and among others that the common would be transitory and uncertain ; that it would follow the person for no certain time or estate, but during his habitancy ; and such manner of interest the law will not suffer, for custom ought to extend to that which hath certainty and continuance. Again ; it will be against the nature and quality of a common, for every common may be suspended or extinguished ; but such a common will be so incident to the person that no one certain can extinguish it, but as soon as he who releases, &c., removes, the new inhabitant will have it. Again ; if the law would allow such common, it would give an action or remedy for it ; but he who claims as an inhabitant can have no action for it. Again ; every commoner must *prescribe* in respect to some estate, not in respect to mere inhabitancy. But it is remarkable that a distinction was expressly taken " between an *interest or profit* to be taken in another's soil, and an *easement* there ;" and an instance is put of a matter of exemption or discharge and of a *way,* for it is said, " they claim not a *charge,* or *profit a prendre* in the soil of another." And, it is added, " so of a custom that every inhabitant of such a town shall have *a way over such land,* either to the church or market, &c.; that is good, for it is but an easement and no profit and a way or passage may well follow the person, and no such inconvenience as in the case at bar." In short, this authority throws the right to *take a profit* exclusively on the common case of prescription in a *que estate,* and it concludes thus : "But a custom that an inhabitant or resident shall grant or take any profit is merely void." If subsequent English cases have allowed customary or prescriptive rights to invade and exclusively to enjoy the soil of another, to the permanent inhabitants of a

certain *town*, they have never extended but uniformly denied it to the inhabitants of the *kingdom* generally.   In *Sherborn* v. *Bostock*, *Fitzg.* 51, on a *habeas corpus cum causa*, it was returned that any one being indebted as executor by simple contract within the city of London, might be sued in the mayor's court.   But it was perceived that a debt being transitory and following the person, any citizen happening to be in London, would be brought within the custom, and it was resolved by the whole court, "that the custom returned being general and such a one as may extend to every subject, whether a citizen or stranger, is void."   In *Fitch* v. *Rawling et al.* 2 *H. Black*. 393, the action was for entering the plaintiff's close at the parish of *Steeple Bumstead* in Essex, and there playing at cricket.   The defendants justified, 1. under an ancient custom for all the *inhabitants of the parish* to enter there and play, and 2. for *all persons for the time being, being in the said parish.*   There was a verdict for the defendant on both pleas ; but though the court held the first plea good, they held the second to be bad, and ordered judgment for the plaintiff.   *Buller*, J. said, "I hold the other custom to be as clearly bad as the first is good.   *How that which may be claimed by all the inhabitants of England can be the subject of a custom, I cannot conceive.   Customs must in their nature be confined to individuals of a particular description,* and what is common to all mankind can never be claimed as a custom.   I perfectly agree that no action could be maintained for interruption of it, any more than in the instance put by my brother *Bond* of a highway."   *Heath*, J. put the case on the impossibility of there being a grant, on which the custom proceeded.   He agreed with Buller, J. and added, "The lord might have *granted* such a privilege as is claimed by *the first custom*, before the time of memory ; as to the second, it is clearly bad, being for all mankind, and on that the case in *Fitz*. 51, is in point."   I shall notice particularly but two more English cases, and these fully justify the view I have already taken of *Gateward's case*.   I said that the public cannot prescribe for a *profit a prendre* in the soil of another, but that this must always be by

an individual on a *que estate.* The further cases directly to this point are *Grimstead* v. *Marlowe,* 4 *T. R.* 717, and *Hardy* v. *Holliday,* cited at large by Buller, J. *id.* 713. Both were much like *Gateward's case,* presenting justifications of customary common of pasture in favor of *all inhabitants of* (the former) *a parish and* (the latter) *a borough.* There were demurrers in both cases ; in the latter assigning for cause that the plea should have prescribed in a *que estate.* It is sufficient to say that in the first case all the judges agreed in what was said by Lord Chief Justice Kenyon, repeating nearly his words. He said, " The right which is claimed is to take a profit *in alieno solo;* but that, according to *Gateward's case* and the case of *Hardy* v. *Holliday,* cannot be claimed by custom. There may be a custom for an easement, *as a right of way, in alieno solo;* but for a profit *a prendre,* the party must *prescribe in a que estate.*" Buller, J. read Lord Chief Justice King's MS. note of *Hardy* v. *Holliday,* in which the whole court agreed, " that where a profit is to be claimed out of another man's soil, it must be alleged *by way of prescription* and not by custom." Several cases were cited to the same effect *arguendo* in the same case by *Palmer* of counsel for the defendant, which he tried in vain to distinguish. The case of *Bell* v. *Wardell, Willes,* 202, *Am. ed.* 1802, was of a customary easement in nature of a way claimed by and allowed to all the inhabitants of the town and county of Newcastle-upon-Tyne. The right was to walk and ride for their health, and several cases are there cited both by the lord chief justice, and the editor in notes, which shew the limitation under which such customs must be taken. None of the English cases that I find, have ever allowed a custom permanently to enjoy the soil of another, to the inhabitants of a whole nation. On the contrary, they hold that the English law denies such a right. The late case of *Blewit* v. *Tregonning,* 3 *Ad. & Ellis,* 554, denies that a custom for the inhabitants of a parish to take a profit in the soil of another can exist.

The law of England coming to us with such restrictions, we now see why no attempt has been there made to press the doc-

trine of dedication beyond a mere right of travel or of way. And here we may notice the great convenience of such a distinction. The right of way lies mainly in streets or roads, for we are not now speaking of the way upon the sea and its arms, nor upon innavigable rivers. The ways on land are, in general, well defined in their extent, even if we include urban commons and walks, or other places of recreation, by travel. The owner of the soil still retains many privileges: such as their being generally open and unincumbered, ornamented with trees, kept in proper repair, open to be depastured by him, &c. The remedies for obstruction are well defined and important: an indictment by the people, an action of trespass by the owner, and on the case by the traveller for special damage. Even ejectment will lie by the owner for a permanent incumbrance ; whereas by a customary profit *a prendre*, as of common, and above all a right to deposit articles of merchandize by all the world, the owner is deprived of the use of the soil itself ; it is covered with buildings, or by piles of lumber, heaps of manure or by merchandize, at the discretion of all people. Should he interfere by fencing or enclosing any part, he is open to indictment, the same as if he should enclose part of a highway. There is no one to release it ; no power to discontinue or change it as in the case of a highway ; and in the case at bar, and all like cases, the law would, for aught I see, by lending its sanction raise a perpetuity.

Then have we any adjudged cases in our own or other states or of the United States, which bind us to depart so widely from the common law ? None in New-York, certainly, which go beyond the right of way or urban pleasure grounds ; and I think we shall hereafter see, in *Cortelyou* v. *Van Brunt*, a refusal to go farther. This court have never gone beyond streets and roads ; and though the court of chancery has proceeded to city and village squares and commons, it still stands far short of the doctrine now claimed of *exclusive appropriation*. If it has allowed the possibility of a grant without a grantee, and thus opened a new road to prescription, no one has yet been allowed

actually to prescribe in a case wherein the law has heretofore held a grant impossible. Besides, grants without grantees have, so far, been confined, by our own chancery at least, to *religious or charitable purposes.* Much may depend on the statute, cited in *Hartford B. Church* v. *Witherell,* 3 *R. S.* 208, 2d ed. § 4, which seems in case of religious societies to allow of a prospective grantee, though I confess I thought, when that case was before me as vice chancellor, where it was first brought, that the grant was utterly unavailable as professing to be made in favor of a legal non-entity ; and I denied the injunction on that ground. The chancellor still denied the injunction, though on another ground ; and his *obiter* adoption of the cases in the United States court can hardly be said to have absolutely naturalized their doctrines even in his own court. I confess with deference, that all the learning I have seen upon the subject, and we have much in the American courts, has not yet convinced my mind that a grant is either good or can even be made so by a court of chancery, either in religious or other cases, where there is no person in existence capable of taking any thing under it. Of course it cannot be presumed. Nor am I convinced that it will help the case to call the grant by another name, that of *dedication,* the limits of which are perfectly restricted and defined by the law, and should remain so.

In *Waters* v. *Lilley,* 4 *Pick.* 145, 148, the supreme court of Massachusetts adopted the law as laid down in *Gateward's case.* The defendant fished in the plaintiff's pond, and being sued in trespass offered to prove an immemorial custom for all the inhabitants of the vicinity to take fish in the pond. Parker, Ch. J., who delivered the opinion of the court, said the custom was one that could not be sustained in law. " If such a right is available at all, it must be set up by prescription, &c. and should be pleaded with a *que estate.*" He cited *Gateward's case,* and *Grimstead* v. *Marlowe.* A subsequent defence in the same court, which seems to me to have depended on the same principle, met with a different reception. In *Coolidge* v. *Learned,* 8 *Pick.* 504, the defendant pleaded a prescriptive right for all

the citizens of the commonwealth to land and deposit lumber on the plaintiff's soil upon the bank of Charles river. The court were mainly occupied in enquiring into the general question whether the doctrine of prescription was at all predicable of Massachusetts, and concluding that it was, they pronounced without citing any authority, that " the right in question is a *public prescriptive right,* and as such is well pleaded." The case is indeed all fours with the one before us. A court sitting under the same system of laws, in a neighboring state, has refused to sanction such a defence. *Bethum* v. *Turner,* 1 *Greenl.* 111. The public had been in the habit of landing lumber from Eastern river on the plaintiff's close, at or near the shore, for thirty-five years before suit brought. On a verdict for the plaintiff, and a motion for a new trial, the decision turned mainly on the sufficiency of the proof to fix the plaintiff with knowledge and give an adverse character to the occupation. It was material, however, for the court to notice whether the defence was known to the law ; in respect to which Mellen, Ch. J., who delivered the opinion of the court, thus expressed himself :. " This user is urged as the foundation of a legal presumption, that the place in question had formerly been *granted as a public landing.* Numerous cases have been cited by the counsel for the defendant to establish this position, and shew that grants have been presumed after a user of little more than twenty years. With respect to these cases, it may be remarked that they relate to *claims of a private nature; of privileges or easements enjoyed by individuals.*" He adds, that the presumption of a *grant* between individuals is the foundation of the defence. The customary landing on the banks of a river seems in *Pennsylvania,* to have been uniformly resisted, as affording no evidence even of a right of way. *Chambers* v. *Furry,* 1 *Yeates* 167, *Cooper* v. *Smith,* 9 *Serg. & Rawle,* 26. The extravagant claim set up in the case at bar, to cover the plaintiff's land with heaps of manure and piles of lumber, was, I think, in effect, repudiated by this court in *Cortelyou* v. *Van Brunt,* 2 *Johns. R.* 357. The defendant, as one of the inhabitants of New-Utrecht,

sought to prescribe for a right of erecting fishing huts on the shore of Long Island, to subserve the right of common fishing in the sea. Mr. Justice Thompson, in delivering the opinion of the court, said, "Nor will prescription, in any case, give a right to erect a building on another's land. This is a mark of title and of exclusive enjoyment, and it cannot be acquired by prescription. Title to land requires the higher evidence of corporeal seisin and investment. Prescription applies only to incorporeal hereditaments, and whether the right claimed be considered as strictly a custom or prescription, the principle is the same ; the only material distinction between them is, that one is local and the other personal in its nature."

Then is the case altered by any statutory provisions or other institutions applicable to Long Island ? Or by any proceedings to create, ascertain or assert a claim to the particular place in question? There were some peculiarities in the Long Island system of roads, which led the legislature, at an early period, to embody the statute regulations for this district by themselves, 2 *R. L. of* 1801, *p.* 191, and they have been so continued in all the subsequent revisals. 2 *R. L. of* 1813, *p* . 304. 3 *R. S. of* 1830, *2d ed.* 243. But these did not, at first, consist in any connection of highways with public landings and watering places : for, it was admitted on the argument, that the latter occur for the first time in the *statute of* 1813, *section* 1, 2, where they are grouped with roads, and placed under the direction of the commissioners of highways in respect to regulating, opening, and altering them, but not as to creating or discontinuing them. The landings and watering places are spoken of as *having been laid out*, or hereafter *to be laid out*, and the second section treats them as *being recorded*, and prescribes the power of the commissioners in removing obstructions and encroachments, and opening them to their recorded width. The 5th section, p. 307, gives an appeal from the commissioners to three county judges, for the purpose of reviewing any regulation of, or refusal to regulate a public landing or watering place ; and directs the mode of proceeding and declares its effect. In the main, these provisions are retained by the

revision of 1830, 3 *R. S.* 243, *to* § 1, *sub.* 1 ; *Id. p.* 251 to 253 ; but both acts, in respect to the mode of creation, the existence and evidence of landings and watering places, leave matters where they found them. The last revision, 3 *R. S.* 254, 5, seems for the first time to have given the power of inquiring summarily, through a justice and jury, into the question of encroachment. This is confined to *highways* properly so called, and the penalty of five dollars for obstruction &c., formerly given, 2 *R. L. of* 1813, *p.* 310, § 15, in respect to *highways, public landings* and *watering places,* is now confined to *roads* and *bridges.* 3 *R. S. of* 1830, 254, § 83. In March, 1835, the commissioners of highways of North Hempstead, assuming the power to have been conferred on them by the statute, 3 *R. S.* 243, § 1, caused the *locus in quo* to be laid out or ascertained as a public landing, and a jury were shortly after convened, on due notice to the plaintiff, who found and certified that he had encroached upon it. Both these proceedings were before us in May term, 1837, when the reversal of the acts of the commissioners by the county judges was affirmed ; and the certificate of the jury and proceedings connected with it were refused to be considered, because not such a judicial matter as could be brought before us for review. The suit, therefore, which was by certiorari, was dismissed. 17 *Wendell,* 9, 15. Yet the certificate is still insisted upon as an answer to the action, in short, as establishing conclusively, by an adjudication involving the question of public landing, that such an easement existed. No power is given by the statute either to the commissioners to lay out, or the jury to certify encroachments upon, a *public landing* EO NOMINE ; such power is confined to *highways,* and I should think, with the intention apparent upon the statute, to exclude any power as to the creation of public landings, even if they are to be deemed in any sense synonymous with highways. The first section, sub. 2, gives the commissioners power " to regulate the roads, public landings, and watering places, already laid out, and to alter such of them as they, or a majority of them, shall deem inconvenient." In the provisions which follow as to describing old and laying out new roads, *landings and watering places*

are excluded all mention ; and so of the proceedings by jury to determine and certify encroachments. All are confined to *high-ways*. This term is said, by the defendant's counsel to be generic, and to comprehend *landings*. The selectmen in *Bethum* v. *Turner*, 1 *Greenl*, 111, had power to lay out *highways*; but their laying out a *landing* and *place of deposit* was held no protection to its occupants ; and we held the same thing in respect to these very men of North Hempstead, in their certiorari against the judges of Queens, 17 *Wendell*, 9, 12.

It is clear to my mind, even if the certificate of the jury were, in a proper case, to have the effect of a judgment between these parties, that the matter was equally beyond their jurisdiction as it was beyond that of the commissioners. As remarked by Chief Justice Nelson, in the case cited, the only way in which they could act favorably to a landing, would be indirectly, by exerting their statute powers for establishing and preventing encroachment on a highway, leading to and connecting with it. In this respect, as to subject matter, the powers of the commissioners and jury are commensurate ; the commissioners may lay out *de novo*, or describe and record an old highway ; and the jury settled the question of encroachment upon highways, where the point is disputed ; but the power does not extend to landings. Independent of what I take to have been the plain intent of the legislature, a *landing*, even though for the purposes of direct transit, is more than a highway. The relative rights, both of owner and passenger in a highway, are perfectly understood and familiarly dealt with by the law. Subject to the right of mere passage, the owner of the soil is still absolute master. The horseman cannot stop to graze his steed, without being a trespasser ; it is only in case of inevitable, or at least accidental detention, that he can be excused even in halting for a moment. The landing of wagons, horses and passengers on the shores of a river, a sea or an ocean, even though it be upon a dedicated or recorded highway on the land connecting with the watery way, and for the direct purpose of going onward, is still a trespass on the riparian owner, unless we could suppose such acts to be performed with-

out any contact between the vessel and the shore. In *Cham-bers* v. *Furry,* 1 *Yeates,* 167, the plaintiff, who owned the eas-tern shore of the Susquehannah river, sued the defendant, who had a right of ferriage from the western shore, in trespass for landing his passengers on, and taking them from the plaintiff's soil, with freight ; for all which he was accustomed to receive ferriage. The landing and reception is said, by the case, to have been from and on board the defendant's flats, which I suppose answered to our scows. The defence was that the *locus in quo* was a public highway. The defendant failed to establish that fact ; but M'Kean, C. J., and Yeates, J., said, " had it been a highway, would it have been a justification? The public would, in that case, have been entitled to a right of passage ; but the title to the soil, the stones, the wood, or the grass growing there-on, would have still continued in the owner of the lands. The use of the ground would have been dedicated to the public for *particular purposes only.* The books lay it down that in Eng-land the right to the bed of a navigable river is presumed to belong to the crown ; and of course, in such case here, to the common-wealth, *usque ad filum aquæ* ; but the right to the adjoining land rests in the owner of the soil. Hence arises the right to wharves in the city of Philadelphia, and commercial ports. No one can use them without making compensation to the respective propri-etors." *Cooper* v. *Smith,* 9 *Serg. & Rawle,* 26, was an ejectment against a ferryman for claiming and exercising a similar right on the plaintiff's soil, who was a riparian owner on the Youghi-ogany river. The court, by Duncan, J. adopted the reasoning in *Chambers* v. *Furry.* They say " the place where the landing was, if a public highway, in an action of trespass would not be a justification. The position of the court " that *Sumral* might lawfully ferry, and land his boats on the public road, was errone-ous, for this was the very question in *Chambers* v. *Furry.* There are a few ferries whose landing is not a common highway." The case was now before the court on error, from the C. P. on the charge of *President Roberts,* who had used that language to the jury now quoted and denied by the court. Yet the case went

for the planitiff, on a failure to make out an actual highway, and the judgment was therefore affirmed.   But in *Chess* v. *Manown*, 3 *Watts*, 219, the very point was decided that you cannot moor your boat, and land from the river on a road, though it be regularly laid out and connected with the boat highway on the river. The court said, " the franchise of the public was to pass over the soil and no more." The case is the stronger as the road was laid out with its termination at low water mark, and as in Pennsylvania, it is well known that all the considerable rivers, even above tide, contrary to the rule in most of the other states, and especially here, are deemed the soil of the state, not of the riparian owners.   *Shrunk* v. *The Schuylkill Nav. Co.* 14 *Serg. & Rawle*, 71.   The right in question was to a hihgway over Manown's farm on the *Monongahela*, which has been judicially pronounced within the local rule.   14 *Serg. & Rawle*, 79, *per Tilghman*, *C. J.*   Still inasmuch as there the owner has a freehold as against all except the state, down to low water mark, it was held that even a road to that point would not sanction the landing with ferry boats and passengers on his land.   The amount of these cases is, that roads are made to be travelled on, and not to be occupied, much less blocked up by sloops and scows.   If the contrary were allowed, the ferryman might derive a profit from his toll, which belongs to the owner, under pretence of a free passage.   The intention of laying out a public highway, is to make a free passage, not a profit to the owners of water craft.   The easement is for land, not water carriage, and therefore is not to be touched by the latter, without the permission of the owner.

To what cases the words *public landings* and *watering places*, which have found their way into the statute concerning Long Island are to be applied, we are still left to conjecture.   The statute goes farther than to suppose a mere prescriptive or customary existence ; it takes them to *have been laid out*, or *hereafter to be laid out* : so far using words applicable to highways, which are laid out by commissioners under prescribed forms : 2 *R. S. of* 1813, *p.* 304, 5.   3 *R. S. of* 1830, *p.* 243 ; *vid. also* 2 *R. L. of*

1813, *p.* 307, § 8, *and* 3 *R. S. of* 1830, *p.* 255, § 93 ; yet we are referred to no power in any one or more persons to lay them out.   The statute studiously avoids any such power.   The attention of counsel was drawn to this subject, by what we said on repudiating the assumed power of the . commissioners, in 17 *Wendell*, 11, 12.   The suggestion was, I think, before counsel, when they tried *Pearsall* v. *Hewlett*, one of the cases now before us ; and it is now confessed that no power has been discovered in any statute or charter to lay out landings.   In one case I perceive, that what was called by the act of 1801, 2 *R. L. p.* 193, § 5, " landing place," simply is, by the later statutes altered to "public landing place." 2 *R. L. of* 1813, *p.* 307, § 8, *and* 3 *R. S. of* 1830, *p.* 255, § 93.   It is said that the laying out, can only mean an appropriation by public user in the nature of a prescription ; but we have, I think, seen clearly that the common law itself stands in the way of any such assumption.   Other statutes, I perceive, assume that tracts of land, common to some towns, are, or were once owned by them ; 3 *R. S. p.* 356, § 17, 20 ; to what extent I do not know ; but in *Oyster Bay*, they are treated as comprehending beaches and marshes.   *Id.* § 20.   Landings and watering places on such lands would be of course, in a degree, public.   In *Cortelyou* v. *Van Brunt*, 2 *Johns. Rep.* 357, a public landing place is presented as *recorded* in the old county book of roads.   It is called a *common landing place*.   The power of commissioners even to regulate watering places, on the assumption that all the neighbors had immemorially used them, has, I know, been resisted, and I think effectually.   The commissioners had twice attempted to regulate a watering place in· *Crab Meadow*, in the town of Huntington, Suffolk county.   It was a pond, about eight rods in circumference.   Pinckney, who claimed the pond, apppealed to three judges of the C. P. first in 1821, when they reversed the decision of the commissioners ; and again, in 1822, when a subsequent decision of the same commissioners was affirmed, on the ground of immemorial user by the public.   From the last decision, the case came before this court, (my notes say,)

Pearsall *v.* Post.

in October term 1827, when the decision was reversed. Two questions were discussed by the judges : 1. The right of the public to interpose such a claim ; and 2. The effect of the first, as a bar to the second proceeding of the commissioners. The only notes I have of the decision appear to be recent, and on what information they were made, I do not remember. The ground is not stated, and I may be mistaken in other respects ; but my notes are full, that difficulties were felt in the course of consultation, as to the legal existence of such public customs ; and the origin and character of the Long Island watering places were not satisfactorily explained. They were assimilated by counsel in argument to that which I have before mentioned from *Co. Litt.* 56, *a.*, which we have seen was local to the people of a definite place. Towns are known to have common lands ; and these reaching the sea shore, on Long Island, may perhaps be thrown out temporarily, or by permanent regulation, at least, for the use of the town's people. It is enough however, that we are thrown upon the common law, which does not recognize any such prescriptive easement for the benefit of a whole people. · *See Manning* v. *Wasdale,* 5 *Adol. & Ellis,* 758.

I will merely add, upon the main question, that considering our extensive lines of coast, immense, when we take into the account our seas, lakes and rivers ; the long public enjoyment throughout, of landings on mere courtesy, and under the notion, I am persuaded, of mere license revocable when the resort should become inconvenient; considering the like circumstances in respect to other objects, such as watering places at the shore and in creeks, springs and wells ; a rule of law, which should admit the possibility of turning such enjoyment into prescriptive and absolute right on the part of the public, would open a field of litigation, which no community could endure. What is still worse in a moral point of view, it would be perverting neighborhood forbearance and good nature, to the destruction of important rights. We shall do quite enough for the public, I imagine, by giving them *dedicated streets and ways;* and at any rate, if we shall hereafter

go with some courts, in refusing to a man the right of modifying a tract of his own land, because it has found its way on to his map, or been talked of by him as a public square of a city or village. For aught I know, we must do this even as to whole farms, which modern speculation may have dedicated as pleasure grounds for lithographic cities. In the court where we sit, however, the doctrine has not yet been practically extended to subserve the purposes of pleasure or fancy.

Our remarks, so far as they regard the identity of the *landing* with a mere *right of way*, are made more especially in respect to the defence of Mr. Hewlett, who is sued by the present plaintiff, for acts which he claims to have performed as a *commissioner of highways*, in working the *locus in quo*, and maintaining his ground there, by assaulting the plaintiff, who came and sought to expel him. Neither his own proceedings, in conjunction with his brother commissioners, nor those before the justice and jury, can protect him, for there was no jurisdiction. So far as the evidence offered in that case went to a *user*, for the purposes of a public landing, we have seen that it was inadmissible, as not going to confer a right on any one.

In no possible view, if we are correct in saying that dedication is predicable only of a *highway*, can the defendant *Post* be protected throughout, for he not only entered and removed the plaintiff's fence, but deposited manure on his land. Clearly this would be an injurious excess, and a trespass upon the soil of any highway. But Hewlett offered to show in addition, that he confined himself to a *dedicated highway*. He too, entered, not for the purpose of passage, but to repair by ploughing down a knoll into a marsh. I say nothing of the supposed benefit to the plaintiff. It was correctly answered, nor is any point made to the contrary, that an owner's soil can not be legally entered and worked by another, under any pretence of supposed benefit. As a private citizen, and without authority from the *overseer of highways*, Hewlett might pass, but could not legally stop and make repairs.

Pearsall *v.* Post.

Had Hewlett offered to prove that the *locus in quo* was a public highway, and that he was simply engaged in repairing it as such, under orders from the town commissioners, I think the proof should have been received. The objection to that on the part of the plaintiff is, that the *locus in quo* having become a *public highway by dedication*, its working and repair, if allowable at all, belonged to those *who used it*, and not to the commissioners ; that to warrant the interference of the town authority, it must have been recorded. That certainly is not a universal requisite ; for the statute itself places roads, which were used 20 years next preceding 1797, though not recorded, on the footing of those which are. 3 *R. S.* 253, § 82. We think a road dedicated to the public, and accepted by the commissioners, may, and must be repaired in the ordinary way. The point was directly resolved in *State* v. *Campton*, 2 *N. H. Rep.* 513, on full consideration ; and in England, it is well settled, that the parish, (which for this purpose answers to our town,) is *prima facie* bound to repair a public road in all cases ; and that if the duty lie upon any other, some special reason should be shown. *Woolr. on Ways.* 76, *and the cases there cited. Ashurst, J. in Rex* v. *Sheffield*, 2 *T. R.* 106, 111. There may be an objection to a *commissioner* interfering personally, and not by an *overseer* ; but we need not inquire farther of his power over the premises as a highway, for he *did not come to it* as being a highway ; his proposition at the outset was to prove it a *public landing place, and place of deposit;* and that the commissioners met and determined to regulate, repair, and alter it as such, and that he was acting under their determination. On the judge rejecting that evidence, he offered to show *in addition*, that the place was a *highway*. He was there without any order to work it *as such*, and comes back therefore to the rank of a private person. No power existed to make the order in respect to a public landing place or depot, to be made out by prescription or custom ; for we have seen that none such can exist, and none other was offered to be shown.

In short, the *landing* and *depot* were the ground on which the defence turned in both causes.    They were allowed as a defence in *Pearsall* v. *Post,* where the verdict was for the defendant, and in which there must be a new trial.    In *Pearsall* v. *Hewlett,* the defence was disallowed, and a verdict found for the plaintiff, and therefore in that cause, a new trial should be denied.

Ordered accordingly.