## Case No. 15,437.

### UNITED STATES v. ILLINOIS CENT. R. CO.

[2 Biss. 174; [1] 1 Chi. Leg. News, 427; 5 Am. Law T. Rep. 309.]

Circuit Court. N. D. Illinois. Aug., 1869.

DEDICATION—BY GOVERNMENT—AT COMMON LAW—GENERAL AND SPECIAL—EMINENT DOMAIN—CONDEMNATION PROCEEDINGS.

1. The making and recording by a proper government agent of a plat of land belonging to the United States, a portion of which was designated as "public ground forever to remain vacant of buildings," with a memorandum added to the plat declaring that this portion, "is not to be occupied with buildings of any description," is a dedication of such portion to public use of the kind and character mentioned in the plat.

2. All the provisions of the state law not having been complied with, it was not a statutory but a common law dedication; the fee did not vest in the city under it.

3. A distinction can be taken between a general and a special dedication, and in this case the

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

fee remained in the United States, which still retain control over it so far as is consistent with the purposes for which it was specially dedicated, and no further.

4. Property having been specially dedicated to a particular purpose, neither the state nor the municipality has the right to divert it from that purpose, except under the right of eminent domain.

5. The right of eminent domain cannot be granted; it can be exercised only by the courts and by the legislature.

6. The legislature cannot take land from the owner and give it to a corporation, even for a public purpose; it must proceed in conformity to the law, and the compensation must be judicially ascertained, and cannot be fixed by statute.

7. The United States has such an interest in the land that it can appeal to a court of equity.

This was a motion for a preliminary injunction on a bill filed in behalf of the United States to restrain the Illinois Central and other railroad companies from taking possession, for depot and other purposes, of the south portion of fractional section 10, township 39 north, range 14, and commonly known as a part of the Lake Front in Chicago.

J. O. Glover, U. S. Dist. Atty.

George Trumbull and J. N. Jewett, for defendants.

DRUMMOND, District Judge. The questions involved in this case are of the very highest importance, affecting interests of great magnitude, and they should be more fully considered and opportunity given for further argument and investigation. I do not propose, now, to do more than state the conclusions at which I have arrived, with perhaps, some incidental argument indicating why I have reached those conclusions.

The facts stated in the bill are not controverted, and are substantially these: After the litigation concerning the south fraction of section 10 in township 39, range 14, east of the third principal meridian, upon which Fort Dearborn was situated, had been settled by the decision of the supreme court of the United States, reported in the case of Wilcox v. Jackson, 13 Pet. [38 U. S.] 498, in favor of the right of the United States to the land, the secretary of war, under the act of congress of 1819 [3 Stat. 520], proceeded to dispose, by sale, of a portion of the land, the right and title to which had been determined to be in the United States by this decision. With the view of facilitating the sale, Mr. Burchard, in 1839, as the agent of the government, made a plat of the land, dividing it into lots, blocks, and streets, etc., by analogy and in conformity with the practice existing under the law of the state concerning town plats. This plat was recorded in the recorder's office. Upon the plat, thus made and recorded, there was a strip of land, south of Randolph street and north of Madison street, and between certain lots and blocks and Lake Michigan, designated as "public ground forever to remain vacant of build-

ings," and by a memorandum added to the plat, it was declared that "the public ground between Randolph and Madison streets, and fronting upon Lake Michigan, is not to be occupied with buildings of any description." Sales were made at the time of many of the lots, in conformity with the plat, and title given under the authority of the secretary of war.

In 1850 [9 Stat. 466], congress granted to the state of Illinois certain lands for the construction of a railroad from Cairo, with branches to Chicago and Galena; and by an act of the legislature of 1851, of this state, the Chicago branch of the Illinois Central Railroad, was terminated at Twelfth street, in the city of Chicago. By a subsequent act, in 1852, authority was given to the Illinois Central Railroad Company to proceed from Twelfth street to the south branch of the Chicago river, and by a contract made with the city and an ordinance affecting the same, between the city and the railroad company, a track was constructed about 400 feet east of Michigan avenue, and from Twelfth street to the south branch of the Chicago river.

The bill alleges that this was done without authority on the part of the United States, and that the latter was not a party in any way to the arrangement.

It will be seen from what has been stated, after the land had been thus set apart, in the way described, that the city of Chicago assumed a certain control and authority over it, making the contract and passing the ordinance upon that assumption. The track thus made by the Illinois Central Railroad Company was used from the time of its construction up to the passage of the recent act of the legislature of April 16, 1869, which has given rise to this controversy.

By that act there was granted to some of the defendants a tract of land described as the south fraction of section 10, for the erection thereon of a passenger depot, and for "such other purposes as the business of said companies may require." In consideration of this grant, thus made by the act of the legislature, the railroad companies, the Illinois Central, Chicago, Burlington and Quincy, and Michigan Central, were required to pay to the city of Chicago $800,000 in the manner therein described; and the common council of the city of Chicago were authorized and empowered to quitclaim and release to the Illinois Central Railroad Company and others, any and all claim and interest affecting the said land.

The bill alleges that under this act of the legislature, these companies threaten to proceed and erect buildings upon the land thus described and set apart for the special public purpose mentioned.

Although the bill has a wider scope as affecting the rights of navigation, yet the only question now submitted is whether, as the case is presented, they have a right, under this act of the legislature, thus to proceed.

First, as to the position of the United States touching this land, the south fraction of section 10.

There can be no doubt, I think, under the facts as stated, that with the consent of the government, through its authorized agent, the land was dedicated to public use of the kind and character mentioned. It may be asked whether this dedication was what is called a statutory dedication, or whether it was a dedication at common law. I think it was a dedication at common law and not under the statute. It is true that there was an attempt, to conform to the conditions required by the law in relation to town plats. It was made out, and recorded, but all the various provisions required by law do not seem to have been complied with. And I understand the rule to be, that, if they are not, it is not a statutory dedication, the effect of which is to vest in the public the fee to the streets and public grounds named and designated upon the plat as such; and this seems to be the result of the decision in the case of U. S. v. City of Chicago, 7 How. [48 U. S.] 185. That decision could not have been made if the supreme court of the United States had supposed that the title in fee of the streets was vested in the city of Chicago, as representing the public. It was a question that necessarily arose in that case, and one submitted and certified up to the supreme court, and upon which the decision of that court was required and given.

It seems to me that a distinction can be taken between a dedication which is general, without any restriction or limitation, and a special dedication for a particular purpose. Here the condition annexed to the dedication was, "public ground forever to remain vacant of buildings." The United States, therefore, hold the title in fee to the land subject to the dedication which had been affixed to it, having, however, no control over it inconsistent with the purpose for which it was dedicated, but, as I apprehend, still having entire control over it consistent with that purpose.

Then, there being this special dedication, the question is as to the power of the general public over it, either the city of Chicago, for certain purposes, representing the rights of the public, or the state of Illinois, for other purposes, so representing them, and of course independent of the power exercised over it as public ground merely, about which there is no controversy here.

It is the undoubted right of every person owning property to dispose of it in such a manner as he chooses, consistently with law and public policy. It is therefore the right of every property holder, unless there is some law or some public policy which prevents, to dedicate his property to public use, general or special; and I apprehend there could not be and was not any law, state or federal, to prevent the special dedication of this property in the way in which it was

designated on the plat by the agent of the government. That being so, when property is thus dedicated what are the rights of the public over it? Can they change the object and purpose of the dedication? Would not this be interfering with the undoubted right of every person to dispose of his property as to him shall seem fit?

There may be, perhaps, some force in the argument which declares that when property is dedicated generally to the public, without specifying the particular purpose, the public may use it for one purpose at one time, and for another at a different time, but where the owner of property dedicates it to a particular public purpose, being not inconsistent with the law or public policy, I deny the right of the state or of the municipality to divert it from that purpose, except under the general authority which the public has to take property for public uses, which is sometimes termed the right of eminent domain. If an individual shall grant a lot of land or square in a city, for the purpose of constructing a school house upon it, or a church, or an institution of science, or for any useful public purpose, that property cannot be taken, as I apprehend, by the public except in the same way that any property can be taken. In one sense, the property of every man, of course, is subject to the control of the government, but then, when thus subject to the government, it is in conformity with law, and in our system under the adjudication of the law by the courts. It is not alone by a simple stroke of legislation, and I think none of the authorities that have been cited are inconsistent with this principle.

The case of Williams v. New York Cent. R. Co., 16 N. Y. 97, proceeds upon the correctness of this doctrine. There the owner of land dedicated a portion of it to the use of the city of Syracuse as a public street. The legislature undertook to grant to the railroad company a portion of the street for a railroad track. The court of appeals of New York held that it could not be done without accountability to the owner of the street. And although some cavil is made with this decision in the case of People v. Kerr, 27 N. Y. 188, still the principle of it is conceded.

The Case of Wellington and Other Petitioners, reported in 16 Pick. 87, is in conformity with this doctrine. The opinion of Chief Justice Shaw proceeds upon the basis that there had not been a diversion, by the act of the legislature, of the land from the public use to which it was appropriated by the owner. That undoubtedly is a strong case, where the question distinctly came up.

The case of Wager v. Troy Union R. Co., 25 N. Y. 526, is also in conformity with this principle.

In fact, what safety would there be in any other rule than this? And when it is enunciated, coupled with the qualification that the state may take the land for public purposes under the right of eminent domain, there certainly cannot be any objection to it; "salus populi est suprema lex;" and this leaves the right of the individual over his property, and the rights of the state, in harmony with each other, maintaining in full force the right of the owner to annex such qualification to the disposition of his property as he chooses, subject, however, to that supreme law, which looks to the safety of the state and which authorizes the appropriation of the property when that safety demands it.

Now what is done in this case? Is the action of the state or of these defendants in conformity with this principle? It grants to these companies the right of the state of Illinois in this land. What is that right? It can only be independent of the easement, and so far as the owner of the property is concerned, the right to appropriate it for public use in conformity with law. Has the legislature of the state the right to divert land which has been appropriated to a special purpose from that purpose, and say that in consequence of that they will give such a compensation to the owner? Is not this what this act does, to all intents and purposes?

It declares that, in consequence of the grant made by the state of Illinois, these defendants, the railroad companies, shall pay to the city of Chicago $800,000 only, while the bill alleges the value of even that part of the grant inclosed between Madison and Randolph streets, to be $2,500,000. It is certainly a diversion, so understood, so contemplated, and not denied by counsel, from the purpose for which the land was originally dedicated.

If this was not the object and purpose, for what were the $800,000 to be given to the city of Chicago?

True, it is said that there are rights affecting this property. There is the right of the owners of lots abutting upon the property; the right of prospect; the right of air and view. That is one thing. But has not the public, in relation to the various streets and public grounds, certain rights as well as owners of lots abutting upon the streets, public squares? And is that right, by a mere stroke of the pen, to be taken away from each individual of the public, where the ground is dedicated to a special purpose? In other words can a mere legislative enactment close up our public streets and parks, and squares? Is there nothing required to give effect to it, and is the individual to be left without any other redress, except what may arise indirectly by an action against the wrongdoer, which shall sound in damages?

This will not be claimed. This is not claimed, as I understand, in this case.

It is said that all that is granted by this legislative act is the rights of the public; that the rights of individuals have to be affected by some other proceeding. That may be true.

There can be no doubt, I apprehend, of the right of every individual owner who may be injured by the wrongful act of these defendants to proceed against them for that injury, and to apply to the court for redress. What is the result in the meantime? The land thus taken, if used for the purpose claimed under this law, can be built up. In other words, the condition annexed to the dedication, declaring that this land was forever to remain vacant of buildings, can be nullified by the construction of buildings and depots. It would seem as though there should be a preventive remery which may arrest this violation of the dedication, rather than to leave the parties to the inadequate redress of an action at law and sounding in damages, merely.

Then, I hold that these principles are true in this case: That the United States remained the owner of this land, subject to the use conferred upon the public by the dedication that was made; that neither the state nor the city has a right to divert the land from the special dedication thus affixed to it, except by the exercise of the right of eminent domain, which must be, not alone by an application to the legislature, but by an application in conformity with the law, and where the rights of the parties can be ascertained.

2 [The only remaining question is, whether the United States is in a position to apply to a court of equity to prevent those acts from being done which the railroad companies seek to do under this law. This is a question about which there may be, and is, some considerable difficulty. No adjudication has been referred to, on either side, where the question has been distinctly presented. It is true that in the case in 27 N. Y. 188, already referred to, the public, together with the owner of the lots abutting upon the street, was made a party plaintiff, and no objection seems to have been taken on that ground. There is a case reported in 11 Paige, 414,—Stuyvesant v. New York,—where the owner of property dedicated a square to public use in the city of New York, to which the municipality assented, and in relation to which they made a contract. The court there held that the owner could call upon the city to comply with its contract. But looking at it upon principle, the question is whether the United States cannot, under the circumstances of the case, call upon a court of equity to effectuate the condition of the grant?

[Under the circumstances detailed, these railroad companies, defendants, threaten to block up land thus dedicated in this particular way to public use. The bill alleges, and for that purpose it must be admitted that there was a warranty, by implication, it is true, on the part of the government to these various persons to whom the property was sold, that the land should thus remain dedicated, in the particular way designated,

and, in point of fact, there can be no doubt of the object and intent of all the parties to this transaction. It was the understanding of the government, through its agent, that this land was to be forever free from buildings, so that there could be an outlook upon the lake. It was dedicated for public purposes, and might be used in various ways, but this never was to be the purpose; buildings never were to be constructed there. Under these circumstances, upon principle, has not a trustee, who thus holds the land subject to the dedication, and to the conditions annexed to it, the right to appeal to a court of equity to enforce the purpose? It seems to me that he has.

[A bill has been filed by the owner of a lot abutting upon this ground, similar in most of the allegations to the bill in this case, and I have been requested to consider a motion for injunction as also made in that case. With the view I have taken of the law of the case, it will be seen that I do not doubt the right of such owner to apply to a court of equity to prevent such a diversion as is contemplated here, and under the circumstances indicated, and I suppose it is not very material in which case the order of the court is made, whether in this or the other. I think it, however, a matter of the very highest importance that, where rights so momentous are involved, and where the consequence of permitting these defendants to proceed and construct buildings might affect so seriously the right of the public, and of private owners, if it should be ultimately determined that this statute of the legislature is not in conformity with those interests, that the order of the court should be made now, on the threshold, before any buildings are constructed.

[It is true that where there is a doubt as to the right for the injunction, that a court of equity does not grant it. But where the court has no doubt of the right to the injunction, and the question is one of pleading, to a certain extent, perhaps the principle might not apply. Looking at it in the absence of authority, and with the best consideration that I have been able to give the subject, I think that the United States may appeal to a court of equity, as it has done.

[It is not necessary to decide whether the act of the legislature causes the property to revert to the original owner or whether it still remains subject to the rights of the public, and the act itself, is alone illegal. The supreme court, in what is called the Pittsburgh Case, reported in 6 Pet. [31 U. S.] 496, seems to think that, where there was a diversion of the land from the original purpose of the dedication, that the land would still remain subject to the original condition and purpose, and that the attempt at diversion would simply be ineffectual. Again, I must confess that I have not been uninfluenced perhaps by the legislation which has been adopted in this case. Do these rail-

road companies want land for the construction of their buildings? There is a way in which they can apply, under the law, for the condemnation of that land, whenever it is for a public purpose. As I understand, the legislature cannot, by a mere enactment, take land from a private owner and give it to a corporation, even for a public purpose. It must proceed in conformity with law, and, if compensation is to be given, the amount is to be properly ascertained, and not determined in advance by a mere word in a statute. The injunction will be granted.] [2]

NOTE. If ground is surveyed and laid off for a public place, and sales made in reference thereto, that amounts to a dedication to the public. Godfrey v. City of Alton, 12 Ill. 29; Trustees of Watertown v. Cowen, 4 Paige, 510. No particular form is necessary to constitute a valid dedication. Marcy v. Taylor, 19 Ill. 634; Waugh v. Leech, 28 Ill. 488; Canal Trustees v. Haven, 11 Ill. 554; Manly v. Gibson, 13 Ill. 312; Dummer v. Selectmen of Jersey City, 20 N. J. Law, 86; Rector v. Hartt, 8 Mo. 448; Woodyer v. Hadden, 5 Taunt. 125; Poole v. Huskinson, 11 Mees. & W. 827; City of Cincinnati v. White's Lessee, 6 Pet. [31 U. S.] 431; Post v. Pearsall, 22 Wend. 425; Knight v. Heaton, 22 Vt. 480; Hobbs v. Inhabitants of Lowell, 19 Pick. 405. Nor is it necessary that the fee be diverted; Kelsey v. King, 33 How. Prac. 39. Property once dedicated cannot be aliened or diverted. City of Alton v. Illinois Transp. Co., 12 Ill. 38; Proctor v. Town of Lewiston, 25 Ill. 153.. A plat of an addition to a town, not executed, acknowledged and recorded in conformity with the statute of the state, operates as a dedication of the streets to public use, but not as a conveyance of the fee to the corporation. Banks v. Ogden, 2 Wall. [69 U. S.] 57. The exhibition or publication of a map of a town with streets and squares marked thereon is evidence of a dedication to public uses. Lownsdale v. City of Portland, 1 Or. 397; Chapman v. School District No. 1 [Case No. 2,607]. If a tract of land be dedicated to the public, as an open square, the public acquire a vested right in it for such purpose. McConnell v. Lexington, 12 Wheat. [25 U. S.] 582; New Orleans v. U. S., 10 Pet. [35 U. S.] 662. Cincinnati v. White, 6 Pet. [31 U. S.] 431; Sargeant v. Bank of Indiana [Case No. 12,360]. The government in laying out the city of New Orleans left an open space in front of the houses, and toward the river marked "Quai" on the plat; held: a dedication to public purposes. Municipality No. 2 v. Orleans Cotton Press, 18 La. 122. See, also, City Council of Lafayette v. Holland, Id. 286; Pulley v. Municipality No. 2, Id. 278; Barrett v. City of New Orleans, 13 La. Ann. 105.