PATRICK *v.* YOUNG MEN'S CHRISTIAN ASSOCIATION OF KALAMAZOO.

1. DEDICATION—PLATS—PUBLIC USES.
   2 Terr. Laws, 577, which provides that an acknowledged and recorded plat, describing lands intended for streets, commons, or "other public uses," shall be deemed a sufficient conveyance to vest the fee in the county, in trust for the purposes expressed, does not apply to land appropriated on a plat to religious denominations, theirs not being a public use, within the meaning of the act.

2. SAME.
   A common-law dedication does not convey a fee.

3. DEEDS—RESERVATION—CONSTRUCTION.
   A conveyance of a specified portion of a quarter-section of land, with the exception of the "streets and squares" in a village included within it, may, in the absence of other means of interpretation, be construed with reference to a recorded plat made by the grantor, although not alluded to in the deed, and held to except a parcel designated in the plat as a "church square."

4. SAME.
   The owners of certain land platted into village lots executed a deed of their interest, excepting, however, from the grant, certain specified lots, and inserting in the deed, after such exception, the following clause: "Together with all the ground intended for streets and public purposes," etc. *Held*, that the clause was a further reservation, and not an additional grant.

5. COMMON-LAW DEDICATION—PLAT AS EVIDENCE.
   Where land was marked "church square" on a plat filed by the owner, and a marginal reference stated that it was appropriated to the first four religious denominations erecting buildings thereon, it is evidence as an act *in pais*, though not within the existing statute respecting dedications of land to public purposes, of a dedication at common law to the denominations appropriating the square.

6. SAME—ADVERSE POSSESSION.
   Where lands dedicated to the use of a religious denomination,

after being occupied under the dedication for several years, are deeded away to a party not within the terms of the dedication, the latter cannot join the grantor's occupancy with his own to establish an adverse holding against the owner of the reversion.

7. SAME—DENOMINATIONAL USE—POWER OF TRANSFER.

A religious society holding lands under a dedication to the use of the denomination it represents cannot transfer the title to a society of a different denomination, or to one that is undenominational.

8. SAME—ABANDONMENT.

After a church society had erected a building on a lot dedicated to the use of one of the first four religious denominations forming a society in the town and erecting a building on the lot, it conveyed the lot to a Young Men's Christian Association, which demolished the church building, and erected a building adapted to its own wants. *Held,* an abandonment of the use for which the lot was dedicated, entitling the holders of the reversionary interest to the lot.

Error to Kalamazoo; Buck, J. Submitted October 21, 1898. Decided May 23, 1899.

Ejectment by Howard M. Patrick and others against the Young Men's Christian Association of Kalamazoo. From a judgment for defendant, plaintiffs bring error. Reversed.

*Charles A. Withey* (*James B. McMahon,* of counsel), for appellants.

*Boudeman & Adams,* for appellee.

HOOKER, J. The plaintiffs are some of the heirs at law of Johnson Patrick, and the action is ejectment, brought to recover the undivided 15-32 of the N. W. ¼ of Church Square, in the city of Kalamazoo (formerly known as the "Town of Bronson"), from its present occupant, the Young Men's Christian Association. This property is situate upon the W. ½ of the S. W. ¼ of section 15, which was located and paid for at the federal land office on November 1, 1830, by Stephen H. Richardson, and on

June 1, 1831, a patent was issued to him from the United States. A few weeks before the patent issued, and on March 12, 1831, Richardson and one Titus Bronson caused to be placed on record in the office of the register of deeds of the county a plat of the village of Bronson, on which plat the land in dispute, with other land, was marked "Church Square," with these explanatory words on the margin of the plat:

"The Church Square is sixteen rods square, and is appropriated to the four first religious denominations who may form societies in the foregoing town, and erect buildings thereon; one-fourth to the benefit of each society."

This plat was not signed by Richardson or Bronson, but was acknowledged by both.

On January 5, 1833, Richardson gave a warranty deed of the W. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of section 15 to Sally Bronson, excepting from the conveyance "the streets and squares of the village of Bronson." On May 4, 1836, Titus Bronson and Sally Bronson, his wife, conveyed to John Berdan, by warranty deed, the W. $\frac{1}{2}$ of S. W. $\frac{1}{4}$ of section 15, with certain exceptions. Counsel for the plaintiffs contend that Church Square was excepted; counsel for the defendant, that it was not. We are of the opinion that it was excepted, but defer a further statement of the contents of the deed until we reach the question in its proper order, if it shall be thought necessary to discuss it. On October 24, 1836, Berdan and wife gave to Sheldon and Burdick a warranty deed of the same land, making the same exceptions.

On March 8, 1838, Richardson and wife gave a quitclaim deed to Johnson Patrick of the west half aforesaid, without any exception of streets or squares; and on April 2, 1838, Johnson Patrick and wife quitclaimed the same, without exceptions, to Dan Arnold. On January 3, 1839, Dan Arnold quitclaimed to Sheldon and Burdick "all that part of the west half [ aforesaid ] conveyed by Titus Bronson and wife to John Berdan by deed of May 4, 1836," and on the same day, viz., January 3, 1839, Arnold quit-

claimed to Johnson Patrick all his right and title to the undivided three-fourths of the west half aforesaid. We interrupt the statement to call attention to the fact that the title conveyed to Patrick depends on what Arnold had left after his conveyance to Sheldon and Burdick, which in turn depends upon the interest conveyed to Berdan by the deed from the Bronsons; and, if the deed from Richardson to the Bronsons excepted Church Square, it is manifest that Berdan received no title to Church Square. If it can be said that the title actually conveyed by Berdan is the test of the description in the first deed from Arnold, it is unnecessary to construe the deed to Berdan; but if we say that the measure of the Arnold deed to Sheldon and Burdick is to depend on the meaning of the description in the deed to Berdan, irrespective of the question of his grantor's title, it is a vital question, because Patrick acquired no title whatever to Church Square if it can be said to have been conveyed to Sheldon and Burdick from Arnold, who apparently had it, unless the plat completely devested Richardson of the title, which is one of the questions in the case.

Passing the question for the present, and resuming the statement of fact, we find a number of other deeds, which do not affect the case, except as they aid in bringing outstanding claims of title into the defendant. Among them are conveyances from other heirs of Johnson Patrick. In 1837, St. Luke's Protestant Episcopal Society was formed, and erected a church building on the premises, and occupied the lot until March 18, 1887, when it deeded the property by quitclaim deed to Senator Stockbridge, receiving from him therefor the sum of $6,500. He bought it for the purpose of donating it to the Young Men's Christian Association with a view to the erection of an expensive building thereon, and soon after deeded it to that society, to apply upon his subscription of $10,000 for that object. The building was thereupon erected at a cost approximating $25,000, and it has since been occupied and used for the ordinary purposes of such society.

It is a trite axiom that in ejectment a plaintiff must rely upon the strength of his own, rather than the weakness of his adversary's, title. We have seen that all of these claims of title come from Richardson, who made several instruments of conveyance. First in order is the plat. If the plat was valid, and conveyed an absolute fee to the religious society, it is manifestly the end of the plaintiffs' claim, because Richardson then parted with his entire title. If it was valid, but did not convey the fee, the plaintiffs must show that they own the reversionary interest. This plat appears to have been made and recorded under a territorial law, first enacted in 1821. 1 Terr. Laws, p. 816, § 1. In 1827 it was re-enacted, with some additional provisions relating to the vacation of plats. 2 Terr. Laws, 577. Section 2 of said act is the important one in this controversy, and is as follows:

" SEC. 2. That such maps or plats as are required by this act to be recorded shall particularly set forth and describe all the public grounds within such town, by its boundaries, courses, and extent, and whether it be intended for streets, alleys, commons, or other public uses, and all the lots intended for sale, by progressive numbers, and their precise length and width; and the maps, made and acknowledged before a justice of the peace, a justice of the county court of the proper town where the town lies, or before a judge of the Supreme Court, and certified under the hand and seal of the judge or justice taking such acknowledgment, and recorded, shall be deemed a sufficient conveyance to vest the fee of such parcels of land as are therein expressed, named, or intended to be for public uses, in the county in which such town lies, in trust to and for the uses and purposes therein named, expressed, or intended, and for no other use or purpose whatever."

Counsel for the plaintiffs contend that a statutory dedication was not effected, for want of a strict compliance with the statute; but we will pass this point.

In its early days the common law recognized dedication of land for highway purposes without grant or covenant, but it is doubtful if the rule went further. A discussion of this subject will be found in the opinion of the late

Chief Justice CAMPBELL in the case of *Baker* v. *Johnston*, 21 Mich. 340. The opinion recognizes the fact, however, that the weight of authority in this country sustains the proposition that the mere want of a grantee will not defeat a dedication of lands for well-defined public purposes, upon an analogy to charitable trusts, which will not be allowed to fail for the mere want of a trustee, where the purposes are clear and well defined, and the instrument by means of which the trust is sought to be created is in other respects adequate to the purpose. In both cases the necessity of definiteness was recognized, while in cases of dedication to public uses it was as important that there should be some one authorized to accept land dedicated for different and specific purposes in their nature public before the dedication could be made effective as it was that there be some one to assume the management of a trust before it could become operative. The opinion cited shows that the doctrine of the common law has been applied to public squares, commons, and parks, and there are cases that hold that gifts may be made to charitable and religious uses in the same way. In *Hunter* v. *Trustees of Sandy Hill*, 6 Hill, 411, it is said:

"Land may be dedicated to pious and charitable purposes, as well as for public ways, commons, and other easements in the nature of ways, so as to conclude the owner who makes the dedication. This is the general doctrine. *Pearsall* v. *Post*, 20 Wend. 111, 22 Wend. 425. Public highways, and sites for court-houses, churches, and other public buildings, are familiar instances of the application of the principle. It has been applied to the reservation of a spring of water for public use (*McConnell* v. *Town of Lexington*, 12 Wheat. 582; and see *City of Cincinnati* v. *White's Lessee*, 6 Pet. 438; also 20 Wend. 120, 22 Wend. 452); to a public square in a village (*Trustees of Watertown* v. *Cowen*, 4 Paige, 510 [27 Am. Dec. 80]); and to a public burying ground (*Beatty* v. *Kurtz*, 2 Pet. 566. See, also, 6 Pet. 431; 22 Wend. 454, 455, 473; *State* v. *Trask*, 6 Vt. 355 [27 Am. Dec. 554])."

In the case of *Benn* v. *Hatcher*, 81 Va. 25 (59 Am. Rep. 645), it was held that a dedication of land for a cemetery was valid, and it was said that:

"In its technical legal sense, dedication is the appropriation of land for a public use,—as for a highway, a common, or the like,—but may be effectual, it seems, when made to a pious or charitable use, though not distinctively a public one."

The statute in question provides in express terms that the plat shall have the effect to convey the fee of land dedicated to public uses to the county. A plat conforming to the statute, then, operates as a conveyance of a fee, though probably it is a base fee. This was an innovation, for under the common-law rule the owner held the fee in trust to the use of the public; but some of the difficulties resulting from this innovation are elucidated by the opinion in the Michigan case last cited, indicating sufficient reasons for a statute which should give to a formal offer of dedication of public ground by a plat the effect of a conveyance by way of grant to uses, and providing a grantee.

A more important question, however, is whether the statute was designed to apply to any dedication other than those made for general public purposes, and whether it is broad enough to permit the plat to be made a medium for the conveyance of land for all kinds of charities or pious uses. In this country we have no established church, and religious uses are in the hands of corporations or voluntary associations. The same is true, with a few exceptions, of charities, such as colleges, hospitals, etc.; and, while dedications may be made to these, there is no apparent reason for requiring the owner to part with the fee, especially as it is after all only a conveyance to uses, and, if the fee were conveyed, it would be but a base fee, determinable on the happening of a collateral event. Again, by the language of the act this provision applies only to "public ground." Public ground, in the ordinary sense, is ground in which the general public has a common use; and it would not accord with the common understanding of the language used to say that land devoted to the use of a local religious society, or hospital, or academy,

created for church, hospital, or academic purposes, is public ground, even if the use be considered, in a sense, public; and, in the absence of a clear intention to include such, the statute ought not to be so construed. Again, the statute itself contains internal evidences that dedications for such purposes were not designed to be within its meaning; for it illustrates the class of public uses to which it alludes, viz., "streets, alleys, commons, or other public uses," and thus, under the settled rule of *ejusdem generis*, its effect was restricted to public uses of a similar nature. See End. Interp. Stat. 405 *et seq.* We are of the opinion, therefore, that there was no statutory dedication, and that the fee remained in Richardson until he conveyed it to Johnson Patrick.

Common-law dedications do not ordinarily convey the fee. In fact, under the strict rule they never do. See cases cited 9 Am. & Eng. Enc. Law (2d Ed.), 73, note 2; *Baker* v. *Johnston, supra.* And though it has been said that "there may be a dedication which is essentially a grant, in which the fee passes," the cases cited in support of the proposition seem to depend upon formal conveyances or statutes. 9 Am. & Eng. Enc. Law (2d Ed.), 74. Thus, in *Van Ness* v. *City of Washington*, 4 Pet. 232, the question was whether the federal government acquired title in fee to the land occupied by streets and public squares in the city of Washington, and the case turned upon the construction to be given to a grant contained in a deed to the government. The case of *Hoadley* v. *City & County of San Francisco*, 50 Cal. 265, arose upon a statute, and the same is true in *U. S.* v. *Illinois Cent. R. Co.*, 2 Biss. 174, *Village of Grandville* v. *Jenison*, 84 Mich. 54, and a large number of other cases; and even in such cases it has been held that a base fee only is conveyed, which is determinable on the happening of a given collateral event. 9 Am. & Eng. Enc. Law (2d Ed.), 74. In the case of *Hunter* v. *Trustees of Sandy Hill, supra*, it is said:

" 'Dedication,' as the term is used in reference to this subject, is the act of devoting or giving property for some proper object, and in such manner as to conclude the owner. The law which governs such cases is anomalous. Under it, rights are parted with and acquired in modes and by means unusual and peculiar. Ordinarily, some conveyance or written instrument is required to transmit a right to real property; but the law applicable to dedications is different. A dedication may be made without writing,—by act *in pais,* as well as by deed. It is not at all necessary that the owner should part with the title which he has, for dedication has respect to the possession, and not the permanent estate. Its effect is not to deprive a party of title to his land, but to estop him, while the dedication continues in force, from asserting that right of exclusive possession and enjoyment which the owner of property ordinarily has. *City of Cincinnati* v. *White's Lessee,* 6 Pet. 431, 438. The principle upon which the estoppel rests is that it would be dishonest, immoral, or indecent, and in some instances even sacrilegious, to reclaim at pleasure property which has been solemnly devoted to the use of the public, or in furtherance of some charitable or pious object. The law therefore will not permit any one thus to break his own plighted faith; to disappoint honest expectations thus excited, and upon which reliance has been placed. The principle is one of sound morals and of most obvious equity, and is in the strictest sense a part of the law of the land. It is known in all courts, and may as well be enforced at law as in equity. This being a case to which the law of dedication applies, the use for which the dedication was made must determine the extent of the right parted with by the owner of the land and acquired by the public. 6 Pet. 438. Where, as in the case of a highway, the public acquire but a mere right of passage, the owner who makes the dedication retains a right to use the land in any way compatible with the full enjoyment of the public easement."

In that case land used for a cemetery was in dispute. The public having laid a road through it, the original owner claimed a forfeiture. In conclusion the court said :

" When the street was opened, a part of the dead, and a part only, had been exhumed, and removed to the new burial ground, and the residue of the bodies still remain.

120 Mich.—13.

Before the suit was instituted, this part of the old grave-
yard was inclosed, and placed in its former condition; the
whole constituting, as it formerly did, but one burial
place.   We think the judge ruled correctly that the plain-
tiff had no right to the possession, and the nonsuit was
therefore proper.   What right, if any, may hereafter arise
in favor of those who can make title from the original
owners, it is not necessary now to inquire.   The land is
still a public graveyard, inclosed, known, and recognized
as such.   When these graves shall have worn away,
when they who now weep over them shall have found
kindred resting places for themselves, when nothing shall
remain to distinguish this spot from the common earth
around, and it shall be wholly unknown as a graveyard,
it may be that some one who can establish a good 'paper
title' will have a right to its possession, for it will then
have lost its identity as a burial ground, and with that all
right founded on the dedication must necessarily become
extinct."

No fee having passed through the dedication, we
must examine the deeds subsequently made by Richard-
son.   His first deed was a warranty deed to Sally Bron-
son of the west half of the quarter section, in which he
excepted the streets of the village of Bronson.   What was
meant by the expression, "with the exception of streets
and squares in the village of Bronson?"   No allusion is
made in the deed to any plat, but we cannot conceive of
any other method of interpreting the deed than by a ref-
erence to the plat, whether we treat it as a valid plat, or a
mere private plat made by the grantor for the purpose of
facilitating sales of land.   There is nothing in the case,
except the plat, to afford any light upon the subject.   An
examination of the plat shows the village laid out into
blocks, some of which are squares and some parallelo-
grams.   Some of each are subdivided into lots, others are
not.   Of the squares, some are marked as squares, thus:
"Church Square," "Jail Square," "Public Square or
Court-House Square," and 'Academy Square," "Burial
Ground," "School Lot;" the last two, however, not
being squares.   We think a reasonable construction

of the deed, in view of the circumstances under which it was made, leads to the exclusion of Church Square from the lands conveyed by Richardson to Sally Bronson. It follows that Johnson Patrick acquired title to the reversionary interest by virtue of the deed from Richardson dated March 8, 1838, and, as we have seen, it was conveyed by him to Arnold. On January 3, 1839, Arnold made two deeds, and this title of the plaintiffs depends on which one conveyed the reversion to these squares; the St. Luke's Episcopal Society being then in possession of the premises, and having erected a church edifice thereon. The first of these deeds to be recorded was a quitclaim deed to Burdick and Sheldon, conveying the premises "conveyed by Titus Bronson and his wife to John Berdan by a deed" therein described. The second was the deed to Patrick, recorded in 1856, and this also was a quitclaim deed.

We will next examine the deed to Berdan, for only by the construction of that deed can we determine whether the squares were included in the deed from Arnold to Burdick and Sheldon. The description was as follows:

"The undivided one-half of the west half of the southwest quarter, also the west half of the southwest quarter, of section number 15, in township number 2 south, and range 11 west, Kalamazoo, Mich., excepting and reserving from sale in the last-mentioned lot the following village lots and parcels of land, namely: One parcel of land, about 11 rods wide, extending from Water street north to east and west quarter section line of said section 15. Also one other parcel of land extending from Main street north to said quarter section line, being 8 rods wide. The former of said parcels having been heretofore deeded to Anthony Cooley. And also the following village lots in the village of Bronson, numbered, according to the last recorded plat of said lots, as follows, namely: 117–two lots north numbered, lying between said lots number 1 and 17. Also lots number 112, 22, 25, 37, 33, 34, 78, 39, 40, 44; said lot 44 being subject to a lease for ten years. Also lots 47, 48, 50, 52, 54, 60, 61, 62, 63, and 56. Also the lots lying between South street and the south line of said

section 15. Also two fractional lots lying between lots 33 and 39 on the west line of said section 15. Also parcel of land 3 rods by 8 lying immediately behind lot number 32, fronting on Main street. Together with all the ground intended for streets and public purposes according to the plat of said village, and together with all the privileges and appurtenances to said land in any way pertaining. To have and to hold the said premises as above described, with the appurtenances, unto the said John Berdan, his heirs and assigns, and to his and their use and behoof forever."

The instrument concluded with the usual covenants of warranty as contained in warranty deeds.

We have already said that the deed from Richardson to Sally Bronson excepted the squares, and it necessarily follows that Berdan took no interest in the squares by this deed. But it might not be a fair construction to put upon the deed from Arnold to Burdick and Sheldon to say that it was meant to convey only what Berdan had acquired title to by the former deed. If we interpret the meaning to be that the description in the deed to Burdick and Sheldon from Arnold should be the same as that in the deed to Berdan, the plaintiffs' title fails if the clause reading, "together with all the ground intended for streets and public purposes according to the plat," etc., is to be construed to be a conveyance, whereas it stands if it is to be treated as an exception. Our deliberate conviction, from the language used, is that it was intended as an exception, because it would seem improbable that Bronson and wife would sell the streets and public grounds and except the lots, and because it seems the natural effect of the language used. This brings us to the conclusion that the plaintiffs have at the least a reversionary interest in this land on the face of the conveyances.

It is contended that a title was gained by adverse possession. The defendant cannot well dispute the claim that its grantor has occupied by virtue of a dedication. Its counsel strenuously insist that it occupied under a statutory dedication, while counsel for the plaintiffs as earnestly assert that it occupied under a common-law dedication, or

its equivalent. The testimony shows that the society erected its first church under the terms of the plat, and there is nothing to indicate that it asserted title in opposition to Richardson's rights for the statutory period necessary to a title by adverse possession. We have said that the dedication gains nothing by the statute. The plat only serves to show what the owner intended, and to make certain the terms under which the St. Luke's Society erected its buildings and maintained possession, from which the offer ripened into a dedication. It is evidence as an act *in pais* of a dedication at common law. *Lessee of Village of Fulton* v. *Mehrenfeld*, 8 Ohio St. 440. The essential elements of hostility and an adverse claim for the necessary period are wanting. All parties at all times seem to have understood that the premises were occupied under the dedication by Richardson, and during later years the recognition of this has been evidenced by efforts to secure deeds from persons in a position to set up claims to a reversionary interest. The evidence shows that the deed from St. Luke's Society was a quitclaim, and that the defendant has secured an undivided interest therein, and that there is, therefore, under the paper title, an estate in common between the plaintiffs and the defendant in the reversion. Thus, in 1886 the heirs of Dan Arnold quitclaimed their interest to Sheldon, and in March, 1887, Sheldon gave a deed to Stockbridge, who also, about the same time, secured deeds from several of the heirs of Johnson Patrick.

There is no doubt of the abandonment of the premises by St. Luke's Church. It sold and vacated the lot and building, and the defendant, after obtaining a deed, demolished the church, and erected a building adapted to its own wants, and, presumably, to the objects of its organization. It is said that these are religious, and that the lot is still devoted to the purposes designed by the proprietor in his offer of dedication. Had the proprietor dedicated directly to St. Luke's Episcopal Society, the case would have been no different in effect than it is now. He

gave to that society, when organized, the use of the premises upon condition of its erecting a building upon them. That a church was intended no one can doubt; and continued user of the gift was, as it is in all such cases, a condition. We cannot look upon this as a passing of title to land upon condition subsequent. We do not mean to say that a misuser necessarily works a reversion to the holder of the fee, but a total abandonment does. *Wanzer* v. *Blanchard*, 3 Mich. 11; *Board of Sup'rs of Kent Co.* v. *City of Grand Rapids*, 61 Mich. 144; *Hunter* v. *Trustees of Sandy Hill, supra.* There was a total abandonment in this case, and the plainest principles of justice require that the original holder's claim should be recognized.

The most forcible reasons given for maintaining a right to the fee in the defendant are the long occupancy of the premises by the St. Luke's Society, its attempt to convey them, the erection of a costly building thereon without opposition, and the continuance of the devotion of the land to pious uses. As we have said, the abandonment was complete. The quitclaim deed from St. Luke's Society does not raise a presumption that it was attempting to do more than to abandon the premises to Stockbridge, who had acquired an interest in the reversion. The erection of the building was at most an improvement of the land by a tenant in common, and therefore within the protection of a court of equity in proceedings for partition (*Van Ormer* v. *Harley*, 102 Iowa, 158); while to hold that a dedication of land for the use of a particular sect would justify the extension of the gift to any pious use by any other association of another denomination, or, indeed, not denominational, would be an arbitrary exercise of judicial power, without authority of law. The *status* of the parties is that the proprietor dedicated the property to a use. The gift was accepted, and the property occupied until the desire for a new church and a large money consideration induced an abandonment by the St. Luke's Society. Whether the purposes for which the proprietor

dedicated the land had been fully accomplished, and the expected benefits to him had accrued, does not appear, and the church does not seem to have concerned itself with that question. It was under no legal obligation to do so, and there may have been no moral obligation upon it to occupy longer than it chose. It certainly had no further legal or moral claim to any interest after abandonment, unless it be the alleged release by Johnson Patrick, which is neither produced nor proven to have been made. We are therefore constrained to hold that the land has reverted to the holder of the original title.

The record shows that all of the testimony in the case is before us, and from the undisputed facts we are able to say that the plaintiffs should have recovered.

The judgment is reversed, and a new trial ordered.

The other Justices concurred.